# EXHIBIT A

AO 88A  (Rev. 12/20) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT

for the

Eastern District of Texas

| | |
|---|---|
| TAASERA LICENSING LLC, | ) |
| _Plaintiff_ | ) |
| v. | ) |
| TREND MICRO INCORPORATED (JAPAN), et al. | ) |
| _Defendant_ | ) |

Civil Action No.   2:22-md-03042, 2:21-cv-00441,
2:22-cv-00468, 2:22-cv-0063,
2:22-cv-00415, 2:22-cv-00427

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:      TAASERA INC.
c/o A Registered Agent Inc.; 8 The Green, Ste. A, Dover, DE 19901

_(Name of person to whom this subpoena is directed)_

✔ Testimony:  YOU ARE COMMANDED to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action. If you are an organization, you must promptly confer in good faith with the party serving this subpoena about the following matters, or those set forth in an attachment, and you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about these matters:  See Attachment A

| Place:   Duane Morris LLP<br>1201 N. Market St., 5th Floor<br>Wilmington, DE 19801 | Date and Time:<br><br>08/11/2023 9:30 am |
|---|---|

The deposition will be recorded by this method:   Stenographically and by video

✔ _Production:_  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and must permit inspection, copying, testing, or sampling of the material:  See Attachment A

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:     07/28/2023

| CLERK OF COURT | | |
|---|---|---|
| | OR | /s/ D. Stuart Bartow |
| _Signature of Clerk or Deputy Clerk_ | | _Attorney's signature_ |

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_
Trend Micro, Incorported (Japan)                                                   , who issues or requests this subpoena, are:

D. Stuart Bartow, 260 Homer Ave. Ste. 202, Palo Alto, CA 94301; dsbartow@duanemorris.com; (650) 847-4150

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No. 2:22-md-03042, 2:21-cv-00441,

## PROOF OF SERVICE

### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❏ I served the subpoena by delivering a copy to the named individual as follows: _____

_____ on *(date)* _____ ; or

❏ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ 0.00 .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

AO 88A  (Rev.  12/20) Subpoena to Testify at a Deposition in a Civil Action (Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

  **(1) *For a Trial, Hearing, or Deposition.*** A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
   **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
   **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
      **(i)** is a party or a party's officer; or
      **(ii)** is commanded to attend a trial and would not incur substantial expense.

  **(2) *For Other Discovery.*** A subpoena may command:
   **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
   **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

  **(1) *Avoiding Undue Burden or Expense; Sanctions.*** A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

  **(2) *Command to Produce Materials or Permit Inspection.***
   **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
   **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
      **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
      **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

  **(3) *Quashing or Modifying a Subpoena.***
   **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
      **(i)** fails to allow a reasonable time to comply;
      **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
      **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
      **(iv)** subjects a person to undue burden.
   **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:

      **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or
      **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
   **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
      **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
      **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

  **(1) *Producing Documents or Electronically Stored Information.*** These procedures apply to producing documents or electronically stored information:
   **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
   **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
   **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
   **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

  **(2) *Claiming Privilege or Protection.***
   **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
      **(i)** expressly make the claim; and
      **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
   **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

# ATTACHMENT A

# DEFINITIONS

A.      The term "Action(s)" shall mean *Taasera Licensing LLC v. Trend Micro, Inc.*, No. 2:21-cv-00441-JRG (E.D. Tex.), *Taasera Licensing LLC v. Check Point Software Technologies Ltd.*, No. 2:22-cv-00063-JRG (E.D. Tex.), *Taasera Licensing LLC v. Fortinet, Inc.*, No. 2:22-cv-00415-JRG (E.D. Tex.),*Taasera Licensing LLC v. Musaruba USA LLC, d/b/a Trellix*, No. 2:22-cv-00427-JRG (E.D. Tex.), *Taasera Licensing LLC v. CrowdStrike, Inc.*, No. 2:22-cv-00468-JRG (E.D. Tex. 2023), and *Taasera Licensing LLC v. Palo Alto Networks, Inc.*, No. 2:23-cv-00113-JRG (E.D. Tex.), which are consolidated as *In re Taasera Licensing LLC, Patent Litigation*, No. 2:22-md-03042-JRG (E.D. Tex.).

B.      The terms "You," "Your" and "Taasera" mean Taasera Inc.

C.      "Taasera Licensing" or "Plaintiff" shall mean Plaintiff Taasera Licensing, LLC, including without limitation its past and present direct and indirect parents, subsidiaries, affiliates, divisions, business units, predecessors in interest, and further includes their respective past and present officers, directors, agents, employees, members, and representatives, and all other persons acting on behalf of any of them.

D.      The term "Defendants" shall refer to Trend Micro, Incorporated (Japan), Check Point Software Technologies, Ltd., Fortinet, Inc., Musaruba USA LLC d/b/a Trellix, CrowdStrike, Inc., CrowdStrike Holdings, Inc., and Palo Alto Networks, Inc., as named in the above Actions.

E.      "Asserted Patents," "Patents-in-Suit," or "Patent-in-Suit" shall refer to U.S. Patent Nos. 8,127,356 (the "'356 Patent"), 8,327,441 (the "'441 Patent"), 8,850,517 (the "'517 Patent"), 8,990,948 (the "'948 Patent"), and 9,092,616 (the "'616 Patent").

F.     "Related Patents" means any patent application or issued patent filed or issued in any country or region (such as with the European Patent Office) that is in any way related to the Patents-in-Suit, including but not limited to foreign counterparts, continuations, continuations in part, divisionals, reexaminations, reissues, provisionals, parent applications or patents, child applications or patents, and PCT applications.

G.     "Patent Practicing Product" means any product, method, or service designed, developed, manufactured, marketed, offered for sale, and/or sold that You contend practices each and every limitation of any claim of the Patents-in-Suit.

H.     "Daedalus Blue" means Daedalus Blue LLC, including without limitation its past and present direct and indirect parents, subsidiaries, affiliates, divisions, business units, predecessors in interest, and further includes their respective past and present officers, directors, agents, employees, members, and representatives, and all other persons acting on behalf of any of them.

I.     "Daedalus Group" means Daedalus Group LLC, including without limitation its past and present direct and indirect parents, subsidiaries, affiliates, divisions, business units, predecessors in interest, and further includes their respective past and present officers, directors, agents, employees, members, and representatives, and all other persons acting on behalf of any of them.

J.     "Daedalus Prime" refers to Daedalus Prime LLC, including without limitation its past and present direct and indirect parents, subsidiaries, affiliates, divisions, business units, predecessors in interest, and further includes their respective past and present officers, directors, agents, employees, members, and representatives, and all other persons acting on behalf of any of them.

K.     "Mavexar" means Mavexar LLC, including without limitation its past and present direct and indirect parents, subsidiaries, affiliates, divisions, business units, predecessors in interest, and further includes their respective past and present officers, directors, agents, employees, members, and representatives, and all other persons acting on behalf of any of them.

L.     "IP Edge" means IP Edge LLC, including without limitation its past and present direct and indirect parents, subsidiaries, affiliates, divisions, business units, predecessors in interest, and further includes their respective past and present officers, directors, agents, employees, members, and representatives, and all other persons acting on behalf of any of them.

M.     "Quest" or "Quest Patent Research" means Quest Patent Research Corp., including without limitation its past and present direct and indirect parents, subsidiaries, affiliates, divisions, business units, predecessors in interest, and further includes their respective past and present officers, directors, agents, employees, members, and representatives, and all other persons acting on behalf of any of them.

N.     The term "relating to" means concerning, pertaining to, discussing, mentioning, containing, reflecting, evidencing, constituting, describing, displaying, showing, identifying, proving, disproving, consisting of, supporting or contradicting.

O.     The terms "document" and "documents" are defined to be synonymous in meaning and equal in scope to the usage of this term in Fed. R. Civ. P. 34(a), and are used in their customary broad sense and include, without limitation, any writing and each original, or a copy in the absence of the original, including but not limited to e-mails, electronically kept records, web pages, books, accounting records, agreements, communications, correspondence, telegrams, telexes, telefaxes, facsimiles, memoranda, recordings, studies, summaries or records of telephone

3

conversations, summaries or records of personal conversations or interviews, letters, forecasts, statistical statements, engineering reports and records, notebooks, charts, graphs, plans, sketches, drawings, video tapes, films, slides, information bearing photographic products of any nature whatsoever, photo-records, microfilms, minutes or records of meetings or conferences, board meeting minutes, lists of persons attending meetings or conferences, reports or summaries of investigations, opinions or reports of consultants, records, sales literature, brochures, catalogues, catalogue sheets, pamphlets, periodicals, advertisements, circulars or trade letters, press releases, trade releases, publicity releases, new product releases, computer printouts, and other data compilations from which information can be obtained.

P.      Each of the terms "any," "all," and "each" shall be construed as "any, all, and/or each."

Q.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

R.      The use of the singular form of any word includes the plural and vice versa.

## **INSTRUCTIONS**

For a statement of your obligations in producing documents under this subpoena, see Rule 45 of the Federal Rules of Civil Procedure, which appears on the reverse side of the subpoena.

A.      Where an objection is made to any discovery request or sub-part thereof, the objection shall state with specificity all grounds for the objection

B.      Objection to production of a document is not grounds for refusing to produce other documents called for by the request, the production of which is not objected to.  If you object to the production of one or more documents, you shall identify in detail the document(s)

whose production is objected to, state the legal grounds for the objection, and produce all other documents for which no objection is made

C.      If any requested document cannot be produced in full, produce the remainder and state whatever information, knowledge, or belief you have concerning the unproduced portion and the reasons you cannot produce the unproduced portion

D.      Where a claim of privilege is asserted in responding or objecting to any discovery request or sub-part thereof,

1)   in the response or objection to the discovery request or sub-part thereof, identify the nature of the privilege (including work product) which is being claimed and if the privilege is being asserted in connection with a claim or defense governed by state law, set forth the state privilege rule being invoked; and

2)   provide the following information in the objection:

a. for documents: (i) the identities of the author(s), addressee(s) and recipient(s); (ii) the type of document; (iii) the general subject matter of the document; (iv) the date of the document; and (v) the location of the document.

b. for oral communications: (i) the identity of the person making the communication and the identity of all persons present while the communication was made and, where not apparent, the relationship of the persons present to the person making the communication; (ii) the date and place of the communication; and (iii) the general subject matter of the communication.

E.      If any document requested to be identified or produced has been destroyed, provide the following additional information as to each such document, (a) the date of destruction

of the document, (b) the reason for the destruction of the document, (c) the identification of the

person who destroyed the document, and (d) the identification of any person who directed that

the document be destroyed.

F.      Where documents in your possession, custody, or control are requested or inquired

of, such request or inquiry includes documents in the possession, custody, or control of each of

your agents, servants, employees, consultants, directors, officers, representatives, and, unless

privileged, your attorneys.

G.      Each document or group of documents produced in response to a document

request shall indicate the number of each and every request to which it is responsive.

H.      All documents are to be produced with their original file folders, file jackets,

envelopes, or covers, or an accurate reproduction thereof.

I.      If an English language version or English language translation of a non-English

document exists, both the non-English language document and the English language version or

English language translation of the non-English document should be produced.  If a written

transcription of an audio and/or video document exists, the written transcription and the audio

and/or video document should be produced.

J.      These discovery requests are deemed to be continuing.  With respect to any of the

following discovery requests as to which you, after responding, discover or acquire additional

responsive material, produce such additional material for inspection and copying, in accordance

with Fed. R. Civ. P. 26(e), promptly after you discover or acquire such additional material.

## **DOCUMENTS TO BE PRODUCED**

1.      Documents sufficient to show each Patent Practicing Product that You have

designed, developed, manufactured, marketed, offered for sale, and/or sold.

2.      Documents sufficient to identify the persons most knowledgeable about the design, development, manufacture, marketing, and sale of the Patent Practicing Products.

3.      Documents sufficient to show the features and functions of each Patent Practicing Product.

4.      Documents sufficient to show the date each Patent Practicing Product was first made, used, sold, and offered for sale in the United States by You or any third party.

5.      All Documents relating to the sale of the Patent Practicing Products, including all Documents identifying (i) the total number of units sold, (ii) gross revenue, (iii) net revenue, (iv) profit margins, (v) cost of goods sold, (vi) and any other financial and sales information relating to the sale of the Patent Practicing Products.

6.      All sales orders and related Communications relating to the Patent Practicing Products.

7.      All Documents relating to the marketing of the Patent Practicing Products.

8.      All Documents related to projections, forecasts, and estimates of potential licensing revenue or royalties related to the monetization of the Asserted Patents or Related Patents.

9.      Documents sufficient to show the features and functions of Your AWARE Preemptive Breach Detection System.

10.     Documents sufficient to show the features and functions of Your NetTrust product.

11.     Documents sufficient to show the features and functions of Your LiveTrust product.

12.     Documents sufficient to show the features and functions of Your INSIDEtrust product.

13.     Documents sufficient to identify the persons most knowledgeable about the design, development, manufacture, marketing, and sale of Your AWARE Preemptive Breach Detection System.

14.     Documents sufficient to identify the persons most knowledgeable about the design, development, manufacture, marketing, and sale of Your NetTrust product.

15.     Documents sufficient to identify the persons most knowledgeable about the design, development, manufacture, marketing, and sale of Your LiveTrust product.

16.     Documents sufficient to identify the persons most knowledgeable about the design, development, manufacture, marketing, and sale of Your INSIDEtrust product.

17.     Documents sufficient to show the date Your AWARE Preemptive Breach Detection System was first made, used, sold, and offered for sale in the United States by You or any third party.

18.     Documents sufficient to show the date Your NetTrust product was first made, used, sold, and offered for sale in the United States by You or any third party.

19.     Documents sufficient to show the date Your LiveTrust product was first made, used, sold, and offered for sale in the United States by You or any third party.

20.     Documents sufficient to show the date Your INSIDEtrust product was first made, used, sold, and offered for sale in the United States by You or any third party.

21.     All Documents relating to the sale of Your AWARE Preemptive Breach Detection System, including all Documents identifying (i) the total number of units sold, (ii) gross revenue, (iii) net revenue, (iv) profit margins, (v) cost of goods sold, (vi) and any other

financial and sales information relating to the sale of the AWARE Preemptive Breach Detection System.

22.   All Documents relating to the sale of Your NetTrust product, including all Documents identifying (i) the total number of units sold, (ii) gross revenue, (iii) net revenue, (iv) profit margins, (v) cost of goods sold, (vi) and any other financial and sales information relating to the sale of the NetTrust product.

23.   All Documents relating to the sale of Your LiveTrust product, including all Documents identifying (i) the total number of units sold, (ii) gross revenue, (iii) net revenue, (iv) profit margins, (v) cost of goods sold, (vi) and any other financial and sales information relating to the sale of the LiveTrust product.

24.   All Documents relating to the sale of Your INSIDEtrust product, including all Documents identifying (i) the total number of units sold, (ii) gross revenue, (iii) net revenue, (iv) profit margins, (v) cost of goods sold, (vi) and any other financial and sales information relating to the sale of the INSIDEtrust product.

25.   All sales orders and related Communications relating to Your AWARE Preemptive Breach Detection System.

26.   All sales orders and related Communications relating to Your NetTrust product.

27.   All sales orders and related Communications relating to Your LiveTrust product.

28.   All sales orders and related Communications relating to Your INSIDEtrust product.

29.   All Documents relating to the marketing of Your AWARE Preemptive Breach Detection System.

30.   All Documents relating to the marketing of Your NetTrust product.

31.   All Documents relating to the marketing of Your LiveTrust product.

32.   All Documents relating to the marketing of Your INSIDEtrust product.

33.   All Documents relating to Your statement that Your products were "[b]ased on cyber security research by SRI International."

34.   Documents sufficient to show Your actual licensing revenue or royalties related to the monetization of the Asserted Patents or Related Patents.

35.   All Documents and Communications relating to offers to license, offers to buy, and/or offers to sell the Asserted Patents or Related Patents.

36.   All Documents and Communications relating to the May 19, 2021 Patent Purchase Agreement executed between You and Taasera Licensing.

37.   Documents sufficient to identify Your corporate structure and personnel, including but not limited to organizational charts.

38.   All Communications between You and Daedalus Blue.

39.   All Communications between You and Daedalus Group.

40.   All Communications between You and Daedalus Prime.

41.   All Communications between You and IP Edge.

42.   All Communications between You and Taasera Licensing.

43.   All Communications between You and Quest.

44.   All Communications between You and Mavexar.

45.   All Communications between You and Jon Scahill.

46.   All Communications between You and Tim Scahill.

47.   All Communications between You and Fabricant LLP.

48.   All Communications between You and any party about any of these Actions.

49.     All Documents and Communications with Buchanan, Ingersoll & Rooney PC and/or Daniel Buri regarding the first maintenance fee for U.S. Patent No. 8,990,948.

50.     All Documents and Communications with Buchanan, Ingersoll & Rooney PC and/or Daniel Buri regarding the first maintenance fee for U.S. Patent No. 9,092,616.

51.     All Documents and Communications with Buchanan, Ingersoll & Rooney PC and/or Daniel Buri regarding the decision not to pay the first maintenance fee for U.S. Patent No. 8,990,948.

52.     All Documents and Communications with Buchanan, Ingersoll & Rooney PC and/or Daniel Buri regarding the decision not to pay the first maintenance fee for U.S. Patent No. 9,092,616.

53.     All Documents and Communications with Buchanan, Ingersoll & Rooney PC and/or Daniel Buri regarding the expiration of U.S. Patent No. 8,990,948 for failure to pay the first maintenance fee.

54.     All Documents and Communications with Buchanan, Ingersoll & Rooney PC and/or Daniel Buri regarding the expiration of U.S. Patent No. 9,092,616 for failure to pay the first maintenance fee.

55.     All Documents and Communications evidencing any investigation, due diligence, or inquiries by You, Buchanan, Ingersoll & Rooney PC, and/or Daniel Buri regarding whether the failure to timely pay maintenance fee for U.S. Patent No. 8,990,948 was intentional or unintentional, including the actions taken, documents and information considered, individuals involved or with knowledge thereof, dates, and the identity of documents evidencing the foregoing.

56.    All Documents and Communications evidencing any investigation, due diligence, or inquiries by You, Buchanan, Ingersoll & Rooney PC, and/or Daniel Buri regarding whether the failure to timely pay maintenance fee for U.S. Patent No. 9,092,616 was intentional or unintentional, including the actions taken, documents and information considered, individuals involved or with knowledge thereof, dates, and the identity of documents evidencing the foregoing.

57.    Documents relating to the delay in paying the first maintenance fee for U.S. Patent No. 8,990,948 from April 29, 2019 until November 13, 2020.

58.    Documents relating to the delay in paying the first maintenance fee for U.S. Patent No. 9,092,616 from September 2, 2019 until November 13, 2020.

59.    Documents evidencing or discussing Your basis for asserting that the delay in payment of the first maintenance fee was unintentional for U.S. Patent No. 8,990,948.

60.    Documents evidencing or discussing Your basis for asserting that the delay in payment of the first maintenance fee was unintentional for U.S. Patent No. 9,092,616.

61.    All Documents and Communications concerning Your first awareness of the fact that a Petition to Accept Unintentionally Delayed Patent with the U.S. Patent Office must be accompanied with a certification of unintentional delay in paying the maintenance fees, including identification of the person(s) most knowledgeable of such circumstances.

62.    Documents evidencing or discussing when You first became aware that You were required to represent to the United States Patent and Trademark Office that the delay in paying the first maintenance fee for U.S. Patent No. 8,990,948 was unintentional.

63.     Documents evidencing or discussing when You first became aware that You were required to represent to the United States Patent and Trademark Office that the delay in paying the first maintenance fee for U.S. Patent No. 9,092,616 was unintentional.

64.     Documents evidencing or discussing whether You have attempted to correct your representation to the United States Patent and Trademark Office that the delay in paying the first maintenance fee for U.S. Patent No. 8,990,948 was unintentional.

65.     Documents evidencing or discussing whether You have attempted to correct your representation to the United States Patent and Trademark Office that the delay in paying the first maintenance fee for U.S. Patent No. 9,092,616 was unintentional.

66.     Documents evidencing or discussing whether any of Your employees knew, prior to the filing of the Petition to Accept Unintentionally Delayed Payment for the U.S. Patent No. 8,990,948, that the Petition would require a certification that the entire delay in paying the maintenance fee was "unintentional," or that revival would otherwise require such certification.

67.     Documents evidencing or discussing whether any of Your employees knew, prior to the filing of the Petition to Accept Unintentionally Delayed Payment for the U.S. Patent No. 9,092,616, that the Petition would require a certification that the entire delay in paying the maintenance fee was "unintentional," or that revival would otherwise require such certification.

68.     Documents sufficient to identify all U.S. patents (by patent number) for which You paid a maintenance fee to the U.S. Patent Office from 2016 to present.

69.     Documents sufficient to identify all U.S. patents (by patent number) for which You filed or caused to be filed a Petition to Accept Unintentionally Delayed Payment from 2016 to present.

70.     All Documents constituting, evidencing, or referring to accusations that You or any of Your employees committed inequitable conduct by filing a false Petition to Accept Unintentionally Delayed Payment, other than Documents filed or produced in this action.

71.     All Documents constituting, evidencing, or referring to Your financial status as of April 29, 2019.

72.     All Documents constituting, evidencing, or referring to Your financial status as of September 2, 2019.

73.     All Documents constituting, evidencing, or referring to Your financial status in 2019 including documents evidencing any costs, bills, invoices, or expenses incurred, the address that the bills, invoices, or expenses were sent to, and whether the address was being monitored.

74.     All Documents constituting, evidencing, or referring to Your inability or failure to pay costs, bills, invoices, or expenses in 2018-2020 including copies of the bills, invoices, expenses.

75.     All documents constituting or evidence Your practices and policies, including any written or verbal procedures and trainings given, regarding the maintenance, expiry, revival, or maintenance fee of patents from 2016 to present.

## **DEPOSITION TOPICS**

1.       Your decision to not timely pay the first maintenance fee for U.S. Patent No. 8,990,948, Including the individuals who made, approved, and executed the decision, all reasons You did not timely pay the fee, which individuals knew those reasons and when they first learned of them, and the existence of Documents evidencing or referring to the foregoing.

2.       Your decision to not timely pay the first maintenance fee for U.S. Patent No. 9,092,616, Including the individuals who made, approved, and executed the decision, all reasons You did not timely pay the fee, which individuals knew those reasons and when they first learned of them, and the existence of Documents evidencing or referring to the foregoing.

3.       Your first awareness of the fact that a Petition to Accept Unintentionally Delayed Patent with the U.S. Patent Office must be accompanied with a certification of unintentional delay in paying the maintenance fees, including the date(s) when such first awareness occurred, the source of the information that led to such first awareness, the identity of all person(s) who received such information, when and how You first obtained such information, and any actions taken by You as a result, along with an identification of the person(s) most knowledgeable of, and all Documents and things concerning, such circumstances.

4.       Any investigation, due diligence, or inquiries by You, Buchanan, Ingersoll & Rooney PC, or Daniel Buri regarding whether the failure to timely pay maintenance fee for U.S. Patent No. 8,990,948 was intentional or unintentional, including the actions taken, documents and information considered, individuals involved or with knowledge thereof, dates, and the identity of documents evidencing the foregoing.

5.       Any investigation, due diligence, or inquiries by You, Buchanan, Ingersoll & Rooney PC, or Daniel Buri regarding whether the failure to timely pay maintenance fee for U.S.

Patent No. 9,092,616 was intentional or unintentional, including the actions taken, documents and information considered, individuals involved or with knowledge thereof, dates, and the identity of documents evidencing the foregoing.

6.      Your factual bases or lack thereof for certifying in the Petition to Accept Unintentionally Delayed Payment for the revival of U.S. Patent No. 8,990,948 that the delay in paying maintenance fee was unintentional, Including the identification of Documents evidencing or discussing the bases, and all persons who had knowledge of such bases by November 13, 2020.

7.      Your factual bases or lack thereof for certifying in the Petition to Accept Unintentionally Delayed Payment for the revival of U.S. Patent No. 9,092,616 that the delay in paying maintenance fee was unintentional, Including the identification of Documents evidencing or discussing the bases, and all persons who had knowledge of such bases by November 13, 2020.

8.      The identities and involvement of Your employees in: (1) the decision not to timely pay the first maintenance fee for U.S. Patent No. 8,990,948; (2) the revival of U.S. Patent No. 8,990,948, Including the Petition to Accept Unintentionally Delayed Payment and instructing counsel to prepare and submit the Petition to the USPTO; and (3) any transfer of rights (potential or actual) to U.S. Patent No. 8,990,948.

9.      The identities and involvement of Your employees in: (1) the decision not to timely pay the first maintenance fee for U.S. Patent No. 9,092,616; (2) the revival of U.S. Patent No. 9,092,616, Including the Petition to Accept Unintentionally Delayed Payment and instructing counsel to prepare and submit the Petition to the USPTO; and (3) any transfer of rights (potential or actual) to U.S. Patent No. 9,092,616.

10.     Your involvement with drafting and/or reviewing drafts of the Petition to Accept Unintentionally Delayed Payment for U.S. Patent No. 8,990,948, Including the identity of any related documents and the individual employees who were involved.

11.     Your involvement with drafting and/or reviewing drafts of the Petition to Accept Unintentionally Delayed Payment for U.S. Patent No. 9,092,616, Including the identity of any related documents and the individual employees who were involved.

12.     The identification of any accusations of inequitable conduct against You (specifically Including any employees) relating to any Petition to Accept Unintentionally Delayed Payment.

13.     Your Communications with Daniel Buri and/or Buchanan, Ingersoll & Rooney PC regarding the (i) failure timely to pay the first maintenance fee for U.S. Patent No. 8,990,948, (ii) expiration of U.S. Patent No. 8,990,948, and (iii) Petition to Accept Unintentionally Delayed Payment for the revival of U.S. Patent No. 8,990,948.

14.     Your Communications with Daniel Buri and/or Buchanan, Ingersoll & Rooney PC regarding the (i) failure timely to pay the first maintenance fee for U.S. Patent No. 9,092,616, (ii) expiration of U.S. Patent No. 9,092,616, and (iii) Petition to Accept Unintentionally Delayed Payment for the revival of U.S. Patent No. 9,092,616.

15.     When and how You first notified Daniel Buri and/or Buchanan, Ingersoll & Rooney PC of the reason(s) that (i) You had not timely paid, and (ii) You did not intend to timely pay, the first maintenance fee for U.S. Patent No. 8,990,948, the content of the Communications, and an identification of documents evidencing the foregoing (including by Bates number or privilege log entry).

17

16.     When and how You first notified Daniel Buri and/or Buchanan, Ingersoll & Rooney PC of the reason(s) that (i) You had not timely paid, and (ii) You did not intend to timely pay, the first maintenance fee for U.S. Patent No. 9,092,616, the content of the Communications, and an identification of documents evidencing the foregoing (including by Bates number or privilege log entry).

17.     Any attempts by You, Daniel Buri and/or Buchanan, Ingersoll & Rooney PC to correct, qualify, or otherwise provide explanation to the USPTO regarding the 2020 representation in the Petition to Accept Unintentionally Delayed Payment for U.S. Patent No. 8,990,948 that the delayed payment of second maintenance fee was unintentional, and if no attempts were made, why not.

18.     Any attempts by You, Daniel Buri and/or Buchanan, Ingersoll & Rooney PC to correct, qualify, or otherwise provide explanation to the USPTO regarding the 2020 representation in the Petition to Accept Unintentionally Delayed Payment for U.S. Patent No. 9,092,616 that the delayed payment of second maintenance fee was unintentional, and if no attempts were made, why not.

19.     Your practices and policies (written or oral), including any written or verbal procedures and trainings given, regarding the maintenance, expiry, revival, or maintenance fee of patents from 2016 to present.

20.     All offers to sell, transfer, license or otherwise grant rights to U.S. Patent No. 8,990,948 or any related U.S. patent or patent application, Including the underlying circumstances, the individuals involved in related Communications, the result of such offers to sell or license, and the reasons for which any offers to sell or license U.S. Patent No. 8,990,948 did not result or have not yet resulted in an actual sale or license.

21.     All offers to sell, transfer, license or otherwise grant rights to U.S. Patent No. 9,092,616 or any related U.S. patent or patent application, Including the underlying circumstances, the individuals involved in related Communications, the result of such offers to sell or license, and the reasons for which any offers to sell or license U.S. Patent No. 9,092,616 did not result or have not yet resulted in an actual sale or license.

22.     Valuations, investigations and analyses of the value of U.S. Patent No. 8,990,948 or the subject matter thereof.

23.     Valuations, investigations and analyses of the value of U.S. Patent No. 9,092,616 or the subject matter thereof.

24.     Projections, forecasts, and estimates of potential licensing revenue or royalties related to the monetization of the Asserted Patents or Related Patents, including the identity of documents evidencing the foregoing.

25.     Your actual licensing revenue or royalties related to the monetization of the Asserted Patents or Related Patents, including the identity of documents evidencing the foregoing.

26.     Your Communications relating to offers to license, offers to buy, and/or offers to sell the Asserted Patents or Related Patents, including the identity of documents evidencing the foregoing.

27.     Your Communications relating to the May 19, 2021 Patent Purchase Agreement executed between You and Taasera Licensing including the identity of documents evidencing the foregoing.

28.     Your financial status as of April 29, 2019.

29.     Your financial status as of September 2, 2019.

19

30.     Your financial status in 2019 including documents evidencing any costs, bills, invoices, or expenses incurred, the address that the bills, invoices, or expenses were sent to, and whether the address was being monitored.

31.     Your inability or failure to pay costs, bills, invoices, or expenses in 2018-2020 including copies of the bills, invoices, expenses.

32.     Your policies and efforts, if any, to ensure compliance with the marking requirements of 35 U.S.C. § 287 as related to the Asserted Patents.

33.     Your (or Your licensee's) marking, or lack thereof, of any product, system, method, device, service, software, platform, and/or technology with the patent number of the Asserted Patent.

34.     The features and functions of Your AWARE Preemptive Breach Detection System.

35.     The features and functions of Your NetTrust product.

36.     The features and functions of Your LiveTrust product.

37.     The features and functions of Your INSIDEtrust product.

38.     The design, development, manufacture, marketing, and sale of Your AWARE Preemptive Breach Detection System.

39.     The design, development, manufacture, marketing, and sale of Your NetTrust product.

40.     The design, development, manufacture, marketing, and sale of Your LiveTrust product.

41.     The design, development, manufacture, marketing, and sale of Your INSIDEtrust product.

42.     The date Your AWARE Preemptive Breach Detection System was first made, used, sold, and offered for sale in the United States by You or any third party.

43.     The date Your NetTrust product was first made, used, sold, and offered for sale in the United States by You or any third party.

44.     The date Your LiveTrust product was first made, used, sold, and offered for sale in the United States by You or any third party.

45.     The date Your INSIDEtrust product was first made, used, sold, and offered for sale in the United States by You or any third party.

46.     The sale of Your AWARE Preemptive Breach Detection System, including (i) the total number of units sold, (ii) gross revenue, (iii) net revenue, (iv) profit margins, (v) cost of goods sold, (vi) and any other financial and sales information relating to the sale of the AWARE Preemptive Breach Detection System.

47.     The sale of Your NetTrust product, including (i) the total number of units sold, (ii) gross revenue, (iii) net revenue, (iv) profit margins, (v) cost of goods sold, (vi) and any other financial and sales information relating to the sale of the NetTrust product.

48.     The sale of Your LiveTrust product, including (i) the total number of units sold, (ii) gross revenue, (iii) net revenue, (iv) profit margins, (v) cost of goods sold, (vi) and any other financial and sales information relating to the sale of the LiveTrust product.

49.     The sale of Your INSIDEtrust product, including (i) the total number of units sold, (ii) gross revenue, (iii) net revenue, (iv) profit margins, (v) cost of goods sold, (vi) and any other financial and sales information relating to the sale of the INSIDEtrust product.

50.     The marketing of Your AWARE Preemptive Breach Detection System.

51.     The marketing of Your NetTrust product.

21

52.     The marketing of Your LiveTrust product.

53.     The marketing of Your INSIDEtrust product.

54.     The authenticity of documents produced in response to this Subpoena.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| IN RE: TAASERA LICENSING LLC, | § | |
| PATENT LITIGATION | § | |
| | § | CIVIL ACTION NO. 2:22-MD-03042-JRG |
| THIS DOCUMENT RELATES TO ALL | § | |
| CASES | § | |

## PROTECTIVE ORDER

Before the Court is the Joint Motion for Entry of Opposed Protective Order (the "Motion")

filed by Taasera Licensing LLC ("Taasera"), Quest Patent Research Corporation ("QPRC"), Palo

Alto Networks Inc. ("Palo Alto Networks"), Check Point Software Technologies, Ltd. ("Check

Point"), Trend Micro Incorporated ("Trend Micro Japan"), Trend Micro, Inc. ("Trend Micro US"),

CrowdStrike, Inc. and CrowdStrike Holdings, Inc. (collectively, "CrowdStrike"), Fortinet, Inc.

("Fortinet"), and Musarubra US LLC d/b/a Trellix ("Trellix"). (Dkt. No. 145). The Court finds that

the Motion should be and hereby is **GRANTED-IN-PART and DENIED-IN-PART**. Having

considered the parties' agreements and disputes, the Court enters the following Protective Order

forthwith:

WHEREAS, Plaintiff/Counterclaim-Defendant Taasera Licensing LLC and Counterclaim-

Defendant Quest Patent Research Corporation (collectively Plaintiffs) and Plaintiffs Trend Micro,

Inc. and Palo Alto Networks, Inc., and Defendants Check Point Software Technologies Ltd., Trend

Micro Incorporated, CrowdStrike, Inc., CrowdStrike Holdings, Inc., Fortinet, Inc., and Musarubra

US LLC, d/b/a Trellix (collectively, "Defendant Groups"), hereafter referred to as "the Parties,"

believe that certain information that is or will be encompassed by discovery demands by the Parties

involves the production or disclosure of trade secrets, confidential business information, or other

proprietary information;

WHEREAS, the Parties seek a protective order limiting disclosure thereof in accordance with Federal Rule of Civil Procedure 26(c):

THEREFORE, it is hereby stipulated among the Parties and ORDERED that:

1.   Each Party may designate as confidential for protection under this Order, in whole or in part, any document, information or material that constitutes or includes, in whole or in part, confidential or proprietary information or trade secrets of the Party or a Third Party to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such document, information or material ("Protected Material").   Protected Material shall be designated by the Party producing it by affixing a legend or stamp on such document, information or material as follows: "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE." The words "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" shall be placed clearly on each page of the Protected Material (except deposition and hearing transcripts) for which such protection is sought.   For deposition and hearing transcripts, the word "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" shall be placed on the cover page of the transcript (if not already present on the cover page of the transcript when received from the court reporter) by each attorney receiving a copy of the transcript after that attorney receives notice of the designation of some or all of that transcript as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE."

2.   Any document produced under Patent Rules 2-2, 3-2, and/or 3-4 before issuance of this Order with the designation "Confidential" or "Confidential - Outside Attorneys' Eyes Only"

shall receive the same treatment as if designated "RESTRICTED - ATTORNEYS' EYES ONLY" under this Order, unless and until such document is redesignated to have a different classification under this Order.

3.  With respect to documents, information or material designated "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" ("DESIGNATED MATERIAL"),[1] subject to the provisions herein and unless otherwise stated, this Order governs, without limitation: (a) all documents, electronically stored information, and/or things as defined by the Federal Rules of Civil Procedure; (b) all pretrial, hearing or deposition testimony, or documents marked as exhibits or for identification in depositions and hearings; (c) pretrial pleadings, exhibits to pleadings and other court filings; (d) affidavits; and (e) stipulations.   All copies, reproductions, extracts, digests and complete or partial summaries prepared from any DESIGNATED MATERIALS shall also be considered DESIGNATED MATERIAL and treated as such under this Order.

4.  A designation of Protected Material (i.e., "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE") may be made at any time. Inadvertent or unintentional production of documents, information or material that has not been designated as DESIGNATED MATERIAL shall not be deemed a waiver in whole or in part of a claim for confidential treatment.  Any party that inadvertently or unintentionally produces Protected Material without designating it as

---

[1] The term DESIGNATED MATERIAL is used throughout this Protective Order to refer to the class of materials designated as "CONFIDENTIAL," "RESTRICTED - ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE," both individually and collectively.

DESIGNATED MATERIAL may request destruction of that Protected Material by notifying the recipient(s), as soon as reasonably possible after the producing Party becomes aware of the inadvertent or unintentional disclosure, and providing replacement Protected Material that is properly designated. The recipient(s) shall then destroy all copies of the inadvertently or unintentionally produced Protected Materials and any documents, information or material derived from or based thereon.

5.     "CONFIDENTIAL" documents, information and material may be disclosed only to the following persons, except upon receipt of the prior written consent of the designating party, upon order of the Court, or as set forth in paragraph 12 herein:

(a)     outside counsel of record in this Action for the Parties;

(b)     employees of such counsel assigned to and reasonably necessary to assist such counsel in the litigation of this Action;

(c)     in-house counsel for the Parties who either have responsibility for making decisions dealing directly with the litigation of this Action, or who are assisting outside counsel in the litigation of this Action;

(d)     up to and including three (3) designated representatives of each of the Parties to the extent reasonably necessary for the litigation of this Action, except that either party may in good faith request the other party's consent to designate one or more additional representatives, the other party shall not unreasonably withhold such consent, and the requesting party may seek leave of Court to designate such additional representative(s) if the requesting party believes the other party has unreasonably withheld such consent;

(e)     outside consultants or experts (*i.e.*, not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of this litigation, provided that: (1) such consultants or experts are not presently employed by the Parties hereto for purposes other than this Action; (2) before access is given, the consultant or expert has completed the Undertaking attached as Exhibit A hereto and the same is served upon the producing Party with a current curriculum vitae of the consultant or expert at least ten (10) days before access to the Protected Material is to be given to that consultant or Undertaking to object to and notify the receiving Party in writing that it objects to disclosure of Protected Material to the consultant or expert. The Parties agree to promptly confer and use good faith to resolve any such objection. If the Parties are unable to resolve any objection, the objecting Party may file a motion

4

with the Court within fifteen (15) days of the notice, or within such other time as the Parties may agree, seeking a protective order with respect to the proposed disclosure. The objecting Party shall have the burden of proving the need for a protective order. No disclosure shall occur until all such objections are resolved by agreement or Court order;

(f)     independent litigation support services, including persons working for or as court reporters, graphics or design services, jury or trial consulting services, and photocopy, document imaging, and database services retained by counsel and reasonably necessary to assist counsel with the litigation of this Action; and

(g)     the Court and its personnel; and

(h)     any other person with the prior written consent of the producing Party.

6.      A Party shall designate documents, information or material as "CONFIDENTIAL" only upon a good faith belief that the documents, information or material contains confidential or proprietary information or trade secrets of the Party or a Third Party to whom the Party reasonably believes it owes an obligation of confidentiality with respect to such documents, information or material.

7.      Documents, information or material produced pursuant to any discovery request in this Action, including but not limited to Protected Material designated as DESIGNATED MATERIAL, shall be used by the Parties (other than the producing Party) only in the litigation of this Action and shall not be used for any other purpose.  Any person or entity who obtains access to DESIGNATED MATERIAL or the contents thereof pursuant to this Order shall not make any copies, duplicates, extracts, summaries or descriptions of such DESIGNATED MATERIAL or any portion thereof except as may be reasonably necessary in the litigation of this Action.  Any such copies, duplicates, extracts, summaries or descriptions shall be classified DESIGNATED MATERIALS and subject to all of the terms and conditions of this Order.

8.      To the extent a producing Party believes that certain Protected Material qualifying to be

designated CONFIDENTIAL is so sensitive that its dissemination deserves even further limitation, the producing Party may designate such Protected Material "RESTRICTED -- ATTORNEYS' EYES ONLY," or to the extent such Protected Material includes computer source code and/or live data (that is, data as it exists residing in a database or databases) ("Source Code Material"), the producing Party may designate such Protected Material as "RESTRICTED CONFIDENTIAL SOURCE CODE."

9.      For Protected Material designated RESTRICTED -- ATTORNEYS' EYES ONLY, access to, and disclosure of, such Protected Material shall be limited to individuals listed in paragraphs 5(a-c) and (e-h).  To the extent a receiving Party wishes to have in-house counsel access Protected Material of a producing Party pursuant to paragraph 5c, the receiving Party shall first disclose to the producing Party the identities of the in-house counsel to whom it proposes to grant access to RESTRICTED – ATTORNEYS' EYES ONLY Protected Material. Such in-house counsel shall not have competitive decision-making authority. The producing Party shall have 3 business days to object to such disclosure, and the Parties agree to meet and confer in good faith to resolve any such objection.

10.     For Protected Material designated RESTRICTED CONFIDENTIAL SOURCE CODE, the following additional restrictions apply:

(a)     Access to a Party's Source Code Material shall be provided only on "stand-alone" computer(s) (that is, the computer may not be linked to any network, including a local area network ("LAN"), an intranet or the Internet). The stand-alone computer(s) shall be capable of temporarily storing electronic copies solely for the limited purposes permitted pursuant to paragraphs 10 (h and j) below. The Parties agree to cooperate in good faith regarding the use of tool(s) requested by the reviewing Party and necessary for source code review. Additionally, the stand-alone computer(s) may only be located at the offices of the producing Party or producing Party's outside counsel in the United States at the producing Party's sole discretion;

6

(b)     The receiving Party shall make reasonable efforts to restrict its requests for such access to the stand-alone computer(s) to normal business hours, which for purposes of this paragraph shall be 8:00 a.m. through 6:00 p.m.  However, upon reasonable notice from the receiving party, the producing Party shall make reasonable efforts to accommodate the receiving Party's request for access to the stand-alone computer(s) outside of normal business hours.  The Parties agree to cooperate in good faith such that maintaining the producing Party's Source Code Material at the offices of producing Party or its outside counsel shall not unreasonably hinder the receiving Party's ability to efficiently and effectively conduct the prosecution or defense of this Action;

(c)     The producing Party shall provide the receiving Party with information explaining how to start, log on to, and operate the stand-alone computer(s) in order to access the produced Source Code Material on the stand-alone computer(s).  No recordable media, recordable devices, input/output devices, devices with Internet or network access, or other electronic devices capable of recording, copying, or transmitting the source code, including without limitation laptops, USB devices, sound recorders, computers, cellular telephones, smartphones, peripheral equipment, cameras, CDs, DVDs, or drives of any kind, shall be permitted in the source code reviewing room. Nor shall the reviewing Party or its expert(s) attempt to circumvent the security of the review computer or confidentiality of the source code displayed.  The producing Party may visually monitor the activities of the receiving Party's representatives during any Source Code Material review, but only to ensure that no unauthorized electronic records of the Source Code Material are being created or transmitted in any way, and only so long as the producing Party cannot hear the receiving Party or view any  handwritten notes. The producing Party shall have the right to confirm identities of the persons accessing Source Code Material;

(d)     The producing Party will produce Source Code Material in computer searchable format on the stand-alone computer(s) as described above;

(e)     Access to Protected Material designated RESTRICTED CONFIDENTIAL - SOURCE CODE shall be limited to outside counsel and up to three (3) outside consultants or experts[2] (*i.e.*, not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of this litigation and approved to access such Protected Materials pursuant to paragraph 5(e) above. Outside counsel and experts conducting source code review shall be permitted to bring into the review room a physical notebook and pens for note taking. Other than the stand-alone computer containing produced Source Code Material, laptops, mobile phones,

---

[2] For the purposes of this paragraph, an outside consultant or expert is defined to include the outside consultant's or expert's direct reports and other support personnel, such that the disclosure to a consultant or expert who employs others within his or her firm to help in his or her source code review and analysis shall count as a disclosure to a single consultant or expert.

cameras, or any other personal electronic devices with camera and/or network functionality shall not be permitted in the review room.  A receiving Party may include excerpts of Source Code Material of no more than 30 contiguous lines of code, contained on no more than two consecutive pages, in a pleading, exhibit, expert report, discovery document, deposition transcript, other Court document, provided that the Source Code Documents are appropriately marked under this Order, restricted to those who are entitled to have access to them as specified herein, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders;

(f)     To the extent portions of Source Code Material are quoted in a Source Code Document, either (1) the entire Source Code Document will be stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE or (2) those pages containing quoted Source Code Material will be separately stamped and treated as RESTRICTED CONFIDENTIAL SOURCE CODE and the first page of the Source Code Document shall be stamped CONTAINS RESTRICTED CONFIDENTIAL SOURCE CODE;

(g)     Except as set forth in paragraph 10(k) below, no electronic copies of Source Code Material shall be made without prior written consent of the producing Party, except as necessary to create documents which, pursuant to the Court's rules, procedures and order, must be filed or served electronically and which comply with the requirements of paragraph 10(e);

(h)     The receiving Party shall be permitted to request up to 2 additional printouts and photocopies of Source Code Material from the producing Party, to be provided by the producing Party according to the time frames set forth in 10(k), all of which shall be designated and clearly labeled "RESTRICTED CONFIDENTIAL SOURCE CODE," and the receiving Party shall  maintain a log of all such printed or photocopied files.

(i)     If the receiving Party's outside counsel, consultants, or experts obtain printouts or photocopies of Source Code Material, the receiving Party shall ensure that such outside counsel, consultants, or experts keep the printouts or photocopies in a secured locked area in the offices of such outside counsel, consultants, or expert. The receiving Party may also temporarily keep the printouts or photocopies at: (i) the Court for any proceedings(s) relating to the Source Code Material, for the dates associated with the proceeding(s); (ii) the sites where any deposition(s) relating to the Source Code Material are taken, for the dates associated with the deposition(s); and (iii) any intermediate location reasonably necessary to transport the printouts or photocopies (*e.g.*, a hotel prior to a Court proceeding or deposition);

(j)     A producing Party's Source Code Material may only be transported by the receiving

Party at the direction of a person authorized under paragraph 10(e) above to another person authorized under paragraph 10(e) above, on paper via hand carry, Federal Express or other similarly reliable courier with signature required upon delivery. When flying with Source Code Material, such Material shall be stored in carry-on luggage. Source Code Material may not be transported or transmitted electronically over a network of any kind, including a LAN, an intranet, or the Internet;

(k)     The receiving Party shall not print more than 30 consecutive pages of continuous Source Code. The receiving Party may request permission to print additional consecutive pages of continuous Source Code. Such requests shall not be unreasonably denied by the producing Party. The receiving Party shall be limited to printing a total of 300 pages of Source Code, where a page is defined as an 8.5" by 11" paper page with 1.25" margins and using no smaller than 12-point font. The receiving Party may request permission to print additional pages of Source Code, which requests shall not be unreasonably denied by the producing Party. If at the time of inspection and requested printing, the producing Party objects to the printed portions as excessive and/or not done for a permitted purpose, the receiving Party shall not be provided with the print portions until such objection is resolved. In the event of an objection, the Parties shall meet and confer in good faith within two (2) business days of the objection and attempt to resolve the dispute on an informal basis. If the Parties are unable to resolve any objection, the receiving party may seek court intervention. If during the course of a review the receiving Party has stored electronic print-outs of Source Code Material (for example a pdf file) on the review computer, the receiving Party may request the producing Party provide the receiving Party with a Bates-labeled and appropriately designated paper copy of the electronic print-outs to the Receiving Party. The producing Party must provide the receiving Party with such Bates-labeled paper copies within three (3) business days of the receiving Party's request. The producing Party will not delete such stored electronic print-outs from the review computer; and

(l)     The Parties agree to meet and confer in good faith regarding the use of copies of Source Code Material in depositions (including remote depositions) and in open court (including at trial).

11.   Any attorney representing a Party, whether in-house or outside counsel, and any person associated with a Party and permitted to receive the other Party's Protected Material that is designated RESTRICTED -- ATTORNEYS' EYES ONLY and/or RESTRICTED CONFIDENTIAL SOURCE CODE (collectively "HIGHLY SENSITIVE MATERIAL"), who obtains, receives, has access to, or otherwise learns, in whole or in part, the other Party's HIGHLY SENSITIVE MATERIAL under this Order shall not be involved in

preparing, prosecuting, supervising, or assisting in the preparation or prosecution of any patent or patent application pertaining to cybersecurity (generally or as described in any of the patents-in-suit) during the pendency of this Action and for one year after its conclusion, including any appeals. To ensure compliance with the purpose of this provision, each Party shall create an "Ethical Wall" between those persons with access to HIGHLY SENSITIVE MATERIAL and any individuals who, on behalf of the Party or its acquirer, successor, predecessor, or other affiliate, prepare, prosecute, supervise or assist in the preparation or prosecution of any patent application pertaining to the field of invention of the patent-in-suit. To avoid any doubt, "Prosecute" as used in this paragraph does not include representing a Party for secretarial purposes, such as, for example, recording assignments and paying maintenance fees and, further, does not include representing a Party in any and all *Inter Partes* Review (IPR) proceedings or other administrative proceedings related to the patents-in-suit (such as *ex parte* reexamination), even if they have received and/or reviewed the other HIGHLY SENSITIVE MATERIAL, provided that they do not participate or assist in any claim drafting or amendment of claims in such proceedings.

12.  Nothing in this Order shall require production of documents, information or other material that a Party contends is protected from disclosure by the attorney-client privilege, the work product doctrine, or other privilege, doctrine, or immunity.  If documents, information or other material subject to a claim of attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity is inadvertently or unintentionally produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any such privilege, doctrine, or immunity.  Any Party that inadvertently or unintentionally produces documents, information or other material it reasonably believes are protected under

the attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity may obtain the return of such documents, information or other material by promptly notifying the recipient(s) and providing a privilege log for the inadvertently or unintentionally produced documents, information or other material. The recipient(s) shall gather and return all copies of such documents, information or other material to the producing Party, except for any pages containing privileged or otherwise protected markings by the recipient(s), which pages shall instead be destroyed and certified as such to the producing Party. The recipients may challenge the producing Party's designation of such materials as protected under the attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity consistent with paragraph 6 of the Court's Discovery Order (Dkt. No. 137).

13.  There shall be no disclosure of any DESIGNATED MATERIAL by any person authorized to have access thereto to any person who is not authorized for such access under this Order. The Parties are hereby ORDERED to safeguard all such documents, information and material to protect against disclosure to any unauthorized persons or entities.

14.  Nothing contained herein shall be construed to prejudice any Party's right to use any DESIGNATED MATERIAL in taking testimony at any deposition or hearing provided that the DESIGNATED MATERIAL is only disclosed to a person(s) who is: (i) eligible to have access to the DESIGNATED MATERIAL by virtue of his or her employment with the designating party, (ii) identified in the DESIGNATED MATERIAL as an author, addressee, or copy recipient of such information, (iii) although not identified as an author, addressee, or copy recipient of such DESIGNATED MATERIAL, has, in the ordinary course of business, seen such DESIGNATED MATERIAL, (iv) a current or former officer, director

or employee of the producing Party or a current or former officer, director or employee of a company affiliated with the producing Party; (v) counsel for a Party, including outside counsel and in-house counsel (subject to paragraphs 9 and 10 of this Order); (vi) an independent contractor, consultant, and/or expert retained for the purpose of this litigation and approved to access such DESIGNATED MATERIAL pursuant to paragraph 5(e) above; (vii) court reporters and videographers; (viii) the Court; or (ix) other persons entitled hereunder to access to DESIGNATED MATERIAL. DESIGNATED MATERIAL shall not be disclosed to any other persons unless prior authorization is obtained from counsel representing the producing Party or from the Court.

15.     Parties may, at the deposition or hearing or within thirty (30) days after receipt of a deposition or hearing transcript, designate the deposition or hearing transcript or any portion thereof as "CONFIDENTIAL," "RESTRICTED - ATTORNEY' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" pursuant to this Order. Access to the deposition or hearing transcript so designated shall be limited in accordance with the terms of this Order.   Until expiration of the 30-day period, the entire deposition or hearing transcript shall be treated as "RESTRICTED – ATTORNEYS' EYES ONLY" in accordance with this Order.

16.     <u>No Cross-Production</u>.   No Defendant is required to produce its DESIGNATED MATERIAL or Plaintiff's responses to its discovery requests to any other Defendant(s). To the extent that any Defendant provides DESIGNATED MATERIAL under the terms of this Protective Order to Plaintiff, Plaintiff shall not share such Defendant's DESIGNATED MATERIAL with any other Defendant(s) absent express written permission from the producing Defendant.

17.     Any DESIGNATED MATERIAL that is filed with the Court shall be filed under seal and shall remain under seal until further order of the Court.  The filing party shall be responsible for informing the Clerk of the Court that the filing should be sealed and for placing the legend "FILED UNDER SEAL PURSUANT TO PROTECTIVE ORDER" above the caption and conspicuously on each page of the filing.  Exhibits to a filing shall conform to the labeling requirements set forth in this Order.  If a pretrial pleading filed with the Court, or an exhibit thereto, discloses or relies on confidential documents, information or material, such confidential portions shall be redacted to the extent necessary and the pleading or exhibit filed publicly with the Court.

18.     The Order applies to pretrial discovery.  Nothing in this Order shall be deemed to prevent the Parties from introducing any DESIGNATED MATERIAL into evidence at the trial of this Action, or from using any information contained in DESIGNATED MATERIAL at the trial of this Action, subject to any pretrial order issued by this Court.

19.     A Party may request in writing to the designating Party that the designation given to any DESIGNATED MATERIAL be modified or withdrawn.  If the designating Party does not agree to redesignation within ten (10) days of receipt of the written request, the requesting Party may apply to the Court for relief.  Upon any such application to the Court, the burden shall be on the designating Party to show why its classification is proper.  Such application shall be treated procedurally as a motion to compel pursuant to Federal Rules of Civil Procedure 37, subject to the Rule's provisions relating to sanctions.   In making such application, the requirements of the Federal Rules of Civil Procedure and the Local Rules of the Court shall be met. Pending the Court's determination of the application, the designation of the designating Party shall be maintained.

20.  Each outside consultant or expert to whom DESIGNATED MATERIAL is disclosed in accordance with the terms of this Order shall be advised by counsel of the terms of this Order, shall be informed that he or she is subject to the terms and conditions of this Order, and shall sign an acknowledgment that he or she has received a copy of, has read, and has agreed to be bound by this Order.  A copy of the acknowledgment form is attached as Appendix A.

21.  To the extent that any discovery is taken of persons who are not Parties to this Action ("Third Parties") and in the event that such Third Parties contended the discovery sought involves trade secrets, confidential business information, or other proprietary information, then such Third Parties may agree to be bound by this Order.

22.  To the extent that discovery or testimony is taken of Third Parties, the Third Parties may designate as "CONFIDENTIAL," "RESTRICTED -- ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" any documents, information or other material, in whole or in part, produced or given by such Third Parties.  The Third Parties shall have ten (10) days after production of such documents, information or other materials to make such a designation.  Until that time period lapses or until such a designation has been made, whichever occurs sooner, all documents, information or other material so produced or given shall be treated as "CONFIDENTIAL" in accordance with this Order.

23.  If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this Action as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE," that Party must promptly notify the designating Party in writing. Such

notification shall include a copy of the subpoena or court order if allowed under applicable protective orders in the other litigation. The Party shall also promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Order. If the designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this Action as "CONFIDENTIAL," "RESTRICTED – ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the designating Party's permission. The designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a receiving Party in this Action to disobey a lawful directive from another court.

24. Within thirty (30) days of final termination of this Action, including any appeals, all DESIGNATED MATERIAL, including all copies, duplicates, abstracts, indexes, summaries, descriptions, and excerpts or extracts thereof (excluding excerpts or extracts incorporated into any privileged memoranda of the Parties and materials which have been admitted into evidence in this Action), shall at the producing Party's election either be returned to the producing Party or be destroyed. No copies shall be retained by a receiving Party or other individuals retained to assist them in this litigation, except counsel may retain copies of pleadings in their files and the terms of this Protective Order shall continue to apply to such copies. The language contained in this paragraph shall not preclude counsel from retaining documents constituting attorney work product as defined by applicable law, or

from retaining one copy of all such work product documents as part of a permanent litigation file that is otherwise subject to the confidentiality restrictions set forth herein. The receiving Party shall verify the return or destruction by affidavit furnished to the producing Party, upon the producing Party's request. Nothing in this order requires a Party to destroy any information it is required by law to retain. The Parties shall not be required to delete information that may reside on electronic disaster recovery systems that are overwritten in the normal course of business, or information that may reside in electronic files which are not reasonably accessible. However, parties and their Counsel shall not retrieve, access, nor use any Protected Material from said electronic disaster recovery systems or other not-reasonably accessible data sources after the conclusion of the matter.

25. The failure to designate documents, information or material in accordance with this Order and the failure to object to a designation at a given time shall not preclude the filing of a motion at a later date seeking to impose such designation or challenging the propriety thereof. The entry of this Order and/or the production of documents, information and material hereunder shall in no way constitute a waiver of any objection to the furnishing thereof, all such objections being hereby preserved.

26. Any Party knowing or believing that any other party is in violation of or intends to violate this Order and has raised the question of violation or potential violation with the opposing party and has been unable to resolve the matter by agreement may move the Court for such relief as may be appropriate in the circumstances. Pending disposition of the motion by the Court, the Party alleged to be in violation of or intending to violate this Order shall discontinue the performance of and/or shall not undertake the further performance of any action alleged to constitute a violation of this Order.

27. Production of DESIGNATED MATERIAL by each of the Parties shall not be deemed a publication of the documents, information and material (or the contents thereof) produced so as to void or make voidable whatever claim the Parties may have as to the proprietary and confidential nature of the documents, information or other material or its contents.

28. Nothing in this Order shall be construed to effect an abrogation, waiver or limitation of any kind on the rights of each of the Parties to assert any applicable discovery or trial privilege.

29. Each of the Parties shall also retain the right to file a motion with the Court (a) to modify this Order to allow disclosure of DESIGNATED MATERIAL to additional persons or entities if reasonably necessary to prepare and present this Action and (b) to apply for additional protection of DESIGNATED MATERIAL.

**So ORDERED and SIGNED this 21st day of February, 2023.**


_____
RODNEY GILSTRAP
UNITED STATES DISTRICT JUDGE

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**MARSHALL DIVISION**

| | | |
|---|---|---|
| IN RE: TAASERA LICENSING LLC, | § | |
| PATENT LITIGATION | § | |
| | § | CIVIL ACTION NO. 2:22-MD-03042-JRG |
| THIS DOCUMENT RELATES TO ALL | § | |
| CASES | § | |

**APPENDIX A**
**UNDERTAKING OF EXPERTS OR CONSULTANTS REGARDING**
**PROTECTIVE ORDER**

I, _____, declare that:

1.   My address is _____.

     My current employer is _____.

     My current occupation is _____.

2.   I have received a copy of the Protective Order in this action.  I have carefully read and understand the provisions of the Protective Order.

3.   I will comply with all of the provisions of the Protective Order.  I will hold in confidence, will not disclose to anyone not qualified under the Protective Order, and will use only for purposes of this action any information designated as "CONFIDENTIAL," "RESTRICTED -- ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" that is disclosed to me.

4.   Promptly upon termination of these actions, I will return all documents and things designated as  "CONFIDENTIAL," "RESTRICTED -- ATTORNEYS' EYES ONLY," or "RESTRICTED CONFIDENTIAL SOURCE CODE" that came into my possession, and all documents and things that I have prepared relating thereto, to the outside counsel for the party by whom I am employed.

1

5.      I hereby submit to the jurisdiction of this Court for the purpose of enforcement of the

Protective Order in this action.

I declare under penalty of perjury that the foregoing is true and correct.

Signature _____

Date _____

# EXHIBIT B

## AFFIDAVIT OF SERVICE
### UNITED STATES DISTRICT COURT
### Eastern District of Texas

Case Number: 2:22-MD-03042

Plaintiff: **TAASERA Licensing LLC**
vs.
Defendant: **Trend Micro Incorporated (Japan), et al.**

For: Duane Morris LLP

Received by _Selena Cabrera_ on the 31st day of July, 2023 at 12:53 pm to be served on **TAASERA, Inc.** by serving its Registered Agent, A Registered Agent Inc., 8 the Green, Suite A, Dover, Kent County, DE 19901. I, _Selena Cabrera_, being duly sworn, depose and say that on the _2nd_ day of _August_, 2023 at _11:00_ a.m., executed service by delivering a true copy of the **Subpoena to Testify at a Deposition in a Civil Action with Attachment A and $40.00 Witness Tender** in accordance with state statutes in the manner marked below:

(✓) CORPORATE SERVICE: By delivering a true copy of the listed documents with the date of service endorsed thereon by me, to: _Charlotte Banice_ as _Document Specialist_ at _8 The Green, Suite A, Dover, Delaware 19901_, _Kent_ County, and informed said person of the contents therein, in compliance with state statutes.

( ) NON SERVICE: For the reason detailed in the comments below.

COMMENTS: _____

I certify that I am over the age of 18, of sound mind, have no interest in the above action. I delivered the listed documents with the date of service endorsed thereon by me and informed the recipient of the contents therein, in compliance with state statutes. The facts stated in this affidavit are within my personal knowledge and are true and correct.

Subscribed and Sworn to before me on the _2nd_ day of _August_, _2023_ by the affiant who is personally known to me.

_____
NOTARY PUBLIC

**HERMINIO CABRERA**
**NOTARY PUBLIC**
**STATE OF DELAWARE**
**My Commission Expires 07-31-2026**

_Selena Cabrera_ 8.2.23

PROCESS SERVER # _n/a_
EXP. DATE: _n/a_
Appointed in accordance with State Statutes

**Austin Process LLC**
**809 Nueces**
**Austin, TX 78701**
**(512) 480-8071**

Our Job Serial Number: 2023007662
Ref: R3437-5

# EXHIBIT C

*State of Delaware*
*Secretary of State*
*Division of Corporations*
*Delivered 05:47 PM 07/08/2011*
*FILED 05:39 PM 07/08/2011*
*SRV 110805361 – 5008259 FILE*

# CERTIFICATE OF INCORPORATION

## OF

## TAASERA, INC.

### ARTICLE I.

The name of this corporation is **Taasera, Inc.** (the "Corporation").

### ARTICLE II.

The address of the registered office of the Corporation in the State of Delaware is 2711 Centerville Road, Suite 400, in the City of Wilmington, County of New Castle.  The name of the registered agent at that address is Corporation Service Company.

### ARTICLE III.

The purpose of the Corporation is to engage in any lawful act or activity for which corporations may be organized under the General Corporation Law of the State of Delaware.

### ARTICLE IV.

The name of the Corporation's incorporator is Joan F. Raulston and the incorporator's mailing address is c/o Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C., 3580 Carmel Mountain Road, Suite 300, San Diego, California 92130.

### ARTICLE V.

This Corporation is authorized to issue one class of stock to be designated "Common Stock".  The total number of shares that the Corporation is authorized to issue is Ten Million (10,000,000) shares, par value $0.001.

### ARTICLE VI.

A director of the Corporation shall not be personally liable to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, except for liability (i) for any breach of the director's duty of loyalty to the corporation or its stockholders, (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law, (iii) under Section 174 of the General Corporation Law of the State of Delaware, or (iv) for any transaction from which the director derived any improper personal benefit.  If the General Corporation Law of the State of Delaware is amended after approval by the stockholders of this Article to authorize corporate action further eliminating or limiting the personal liability of directors then the liability of a director of the corporation shall be eliminated

or limited to the fullest extent permitted by the General Corporation Law of the State of Delaware as so amended.

Any repeal or modification of the foregoing provisions of this Article VI by the stockholders of the Corporation shall not adversely affect any right or protection of a director of the Corporation existing at the time of such repeal or modification.

## ARTICLE VII.

The Corporation reserves the right to amend, alter, change or repeal any provision contained in this Certificate of Incorporation, in the manner now or hereafter prescribed by statute, and all rights conferred on stockholders herein are granted subject to this reservation.

## ARTICLE VIII.

Election of directors need not be by written ballot unless the Bylaws of the Corporation shall so provide.

## ARTICLE IX.

The number of directors which shall constitute the whole Board of Directors of the Corporation shall be fixed from time to time by, or in the manner provided in, the Bylaws of the Corporation or in an amendment thereof duly adopted by the Board of Directors of the Corporation or by the stockholders of the Corporation.

## ARTICLE X.

Meetings of stockholders of the Corporation may be held within or without the State of Delaware, as the Bylaws of the Corporation may provide.  The books of the corporation may be kept (subject to any provision contained in the statutes) outside the State of Delaware at such place or places as may be designated from time to time by the Board of Directors of the Corporation or in the Bylaws of the Corporation.

## ARTICLE XI.

Except as otherwise provided in this Certificate of Incorporation, in furtherance and not in limitation of the powers conferred by statute, the Board of Directors of the Corporation is expressly authorized to make, repeal, alter, amend and rescind any or all of the Bylaws of the Corporation.

IN WITNESS WHEREOF, the undersigned has signed this Certificate of Incorporation this 8th day of July, 2011.

Joan F. Raulston, *Sole Incorporator*

2.

# EXHIBIT D

State of Delaware
Secretary of State
Division of Corporations
Delivered  04:19 PM 11/02/2016
FILED  04:19 PM 11/02/2016
SR 20166470197 - File Number 5008259

# AMENDMENT TO THE AMENDED AND RESTATED

## CERTIFICATE OF INCORPORATION

## OF

## TAASERA, INC.

The corporation organized and existing under and by virtue of the General Corporation Law of the State of Delaware does hereby certify:

**FIRST:**　　　　That at a meeting of the Board of Directors of Taasera, Inc. (the "Corporation") resolutions were duly adopted setting forth a proposed amendment to the Amended and Restated Certificate of the Corporation, declaring said amendment to be advisable and submitting such amendment to the stockholders of the Corporation for consideration thereof. The resolution setting forth the proposed amendment is as follows:

**RESOLVED**, that the Amended and Restated Certificate of Incorporation of the Corporation be amended by adding new subsection I to Section 5.8(b)(i) of Article V thereof, to read as follows:  "Shares issued pursuant to the transactions contemplated by the Company's Secured Note and Warrant Purchase Agreement dated July 11, 2016 (the "Agreement") and the Exhibits thereto including, without limitation, any warrants issued pursuant thereto, any warrants issued to management as described in the Exhibits thereto, any warrants issued in connection with the placement of any securities issued pursuant to the Agreement, any shares issued pursuant to the exercise of any of such warrants, any New Preferred as described in the Notes issued pursuant to the Agreement, any adjustment to the conversion ratio of the Bridge Notes as described in Section 4.1(e) of the Agreement or any issuance of any shares pursuant to the conversion of such Bridge Notes."; and be it

**FURTHER RESOLVED**, that the Amended and Restated Certificate of Incorporation of the Corporation be amended by adding new subsection (i) to Section 7.1 of Article V thereof, to read as follows:  "Shares issued pursuant to the transactions contemplated by the Company's Secured Note and Warrant Purchase Agreement dated July 11, 2016 (the "Agreement") and the Exhibits thereto including, without limitation, any warrants issued pursuant thereto, any warrants issued to management as described in the Exhibits thereto, any warrants issued in connection with the placement of any securities issued pursuant to the Agreement, any shares issued pursuant to the exercise of any of such warrants, any New Preferred as described in the Notes issued pursuant to the Agreement, any adjustment to the conversion ratio of the Bridge Notes as described in Section 4.1(e) of the Agreement or any issuance of any shares pursuant to the conversion of such Bridge Notes."

**SECOND:**　　That thereafter, pursuant to resolution of its Board of Directors, the stockholders of said corporation, by written consent in accordance with Section 228 of the General Corporation Law of the State of Delaware, approved the amendment.

**THIRD:**　　That said amendment was duly adopted in accordance with the provisions of Section 242 of the General Corporation Law of the State of Delaware.

**IN WITNESS WHEREOF**, said corporation has caused this Amendment to the Amended and Restated Certificate of Incorporation, as amended, to be signed by its duly authorized officer and the foregoing facts stated herein are true and correct.

Date:  October 31, 2016                                  **Taasera, Inc.**


                                                         By: /s/ David Brigati
                                                         Name:  David Brigati
                                                         Title:   President, CEO and SVP Sales

202759789.4

# EXHIBIT E

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | | TAX YR. |
|---|---|---|
| TAASERA, INC. | | 2011 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE | |
|---|---|---|---|
| 5008259 | 2011/07/08 | 2012/03/01 | |

**PRINCIPAL PLACE OF BUSINESS**
1030 State Street, 3rd Floor

**PHONE NUMBER**
814/456-9963

Erie PA 16501 United States

**REGISTERED AGENT**
CORPORATION SERVICE COMPANY

**AGENT NUMBER**
9000014

2711 CENTERVILLE ROAD
SUITE  400

WILMINGTON                     DE 19808

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2011/07/08 | | COMMON | 10,000,000 | .001000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| | Kurt F. Buseck | | |
| | 1030 Street Street, 3rd Floor | | Chief Financial Officer |
| | Erie PA 16501 United States | | |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| | Kurt F. Buseck 1030 State Street, 3rd Floor Erie PA 16501 United States | |
| | Dennis Pollutro 1030 State Street, 3rd Floor Erie PA 16501 United States | |
| | C. Scott Hartz 1030 State Street, 3rd Floor Erie PA 16501 United States | |
| | Robert M. Mehalso 1030 State Street, 3rd Floor Erie PA 16501 United States | |

Total number of directors:5

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| Kurt F. Buseck | | |
| 1030 Street Street, 3rd Floor | 2012-05-24 | Chief Financial Officers |
| Erie PA 16501 United States | | |

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| TAASERA, INC. | 2011 |

FILE NUMBER
5008259

DIRECTORS     NAME     STREET/CITY/STATE/ZIP
John DeSantis
1030 State Street, 3rd Floor
Erie PA 16501 United States

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| TAASERA, INC. | 2012 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5008259 | 2011/07/08 | |

**PRINCIPAL PLACE OF BUSINESS**
1030 State Street, Suite 301

**PHONE NUMBER**
814/456-9963

Erie PA 16501 United States

**REGISTERED AGENT**
CORPORATION SERVICE COMPANY

**AGENT NUMBER**
9000014

2711 CENTERVILLE RD STE 400

WILMINGTON                DE 19808

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2012/07/27 | | COMMON | 60,000,000 | .001000 |
| | | PREFERRED | 20,000,000 | .001000 |
| 2011/07/08 | 2012/07/27 | COMMON | 10,000,000 | .001000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|

Kurt F Buseck

1030 State Street, Suite 301                                    CFO

Erie PA 16501 United States

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|

Kurt F Buseck
1030 State Street, Suite 301
Erie PA 16501 United States

C Scott Hartz
2 Bala Plaza Suite, Suite 300
Bala Cynwyd PA 19004 United States

Robert M Mehalso
39 Emerald Hill Circle
Fairport NY 14450 United States

==============================================================================
Total number of directors:3

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

**AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR)**                    DATE          TITLE
Kurt F Buseck

1030 State Street, Suite 301                                    CFO
                                          2013-02-26

Erie PA 16501 United States

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| TAASERA, INC. | 2013 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5008259 | 2011/07/08 | |

**PRINCIPAL PLACE OF BUSINESS**
1030 State Street, 3rd Floor

PHONE NUMBER
814/456-9963

Erie PA 16501 United States

**REGISTERED AGENT**
CORPORATION SERVICE COMPANY

AGENT NUMBER
9000014

2711 CENTERVILLE RD STE 400

WILMINGTON          DE 19808

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2013/10/01 | | COMMON | 50,000,000 | .001000 |
| | | PREFERRED | 22,000,000 | .001000 |
| 2012/07/27 | 2013/10/01 | COMMON | 60,000,000 | .001000 |
| | | PREFERRED | 20,000,000 | .001000 |

| OFFICER NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| Kurt F. Buseck | | |
| | 1030 State Street, 3rd Floor | CFO |
| | Erie PA 16501 United States | |

| DIRECTORS NAME | STREET/CITY/STATE/ZIP |
|---|---|
| Kurt F. Buseck | 1030 State Street, 3rd Floor Erie PA 16501 United States |
| C. Scott Hartz | 1030 State Street, 3rd Floor Erie PA 16501 United States |
| Robert Mehalso | 1030 State Street, 3rd Floor Erie PA 16501 United States |
| James Stanton | 1030 State Street, 3rd Floor Erie PA 16501 United States |

================================================================================
Total number of directors:4

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR)          DATE          TITLE
Kurt F. Buseck

1030 State Street, 3rd Floor                                             CFO

                                         2014-02-27

Pittsburgh PA 16501 United States

# State of Delaware
# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| TAASERA, INC. | 2014 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5008259 | 2011/07/08 | |

**PRINCIPAL PLACE OF BUSINESS**
1030 State Street Suite 301

**PHONE NUMBER**
814/456-9963

Erie PA 16501 United States

**REGISTERED AGENT**
CORPORATION SERVICE COMPANY

**AGENT NUMBER**
9000014

2711 CENTERVILLE RD
SUITE 400

WILMINGTON          DE 19808

| AUTHORIZED STOCK BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2014/06/17 | | COMMON | 60,000,000 | .001000 |
| | | PREFERRED | 28,000,000 | .001000 |
| 2013/10/01 | 2014/06/17 | COMMON | 50,000,000 | .001000 |
| | | PREFERRED | 22,000,000 | .001000 |

| OFFICER NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| Kurt F Buseck | | |
| 1030 State Street Suite 301 | | CFO |
| Erie PA 16501 United States | | |

| DIRECTORS NAME | STREET/CITY/STATE/ZIP |
|---|---|
| Corporation currently has no Directors | |

================================================================================
Total number of directors:0

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

**AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR)**          DATE          TITLE
Kurt F Buseck

1030 State Street Suite 301                                                    CFO

                                        2015-02-25

Erie PA 16501 United States

# *State of Delaware*

# *Annual Franchise Tax Report*

| CORPORATION NAME | TAX YR. |
|---|---|
| TAASERA, INC. | 2015 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5008259 | 2011/07/08 | |

**PRINCIPAL PLACE OF BUSINESS**
1030 STATE STREET SUITE 301
ERIE, PA 16501

**PHONE NUMBER**
8144569963

**REGISTERED AGENT**
CORPORATION SERVICE COMPANY
2711 CENTERVILLE RD
SUITE 400
WILMINGTON DE  19808

**AGENT NUMBER**
9000014

### AUTHORIZED STOCK

| BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2015/10/14 | | COMMON | 50,000,000 | $0.001000 |
| | | PREFERRED | 40,000,000 | $0.001000 |
| 2014/06/17 | 2015/10/14 | COMMON | 60,000,000 | $0.001000 |
| | | PREFERRED | 28,000,000 | $0.001000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| KURT F BUSECK | | 1030 STATE STREET SUITE 301 ERIE, PA 16501 | CFO |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| | | AN EXTERNAL DOCUMENT OF DIRECTORS FOLLOWS |

*NOTICE:  Pursuant to 8 Del. C. 502(b),  If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| KURT F BUSECK 1030 STATE STREET SUITE 301 ERIE, PA 16501 US | 2016/03/01 | CFO |

File Number: 5008259

| | Name | Address1 | Address2 | City | State | Postal Code | Country |
|---|---|---|---|---|---|---|---|
| 1. | C Scott Hartz | 1030 State Street Suite 301 | | Erie | PA | 16501 | US |
| 2. | Kurt Buseck | 1030 State Street Suite 301 | | Erie | PA | 16501 | US |
| 3. | James Stanton | 1030 State Street Suite 301 | | Erie | PA | 16501 | US |
| 4. | Srinivas Kumar | 1030 State Street Suite 301 | | Erie | PA | 16501 | US |
| 5. | Robert Mehalso | 1030 State Street Suite 301 | | Erie | PA | 16501 | US |
| 6. | Howard Schmidt | 1030 State Street Suite 301 | | Erie | PA | 16501 | US |
| 7. | Susan Kozik | 1030 State Street Suite 301 | | Erie | PA | 16501 | US |

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| TAASERA, INC. | 2016 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5008259 | 2011/07/08 | |

**PRINCIPAL PLACE OF BUSINESS**
175 SOUTH MAIN STREET, SUITE 500
SALT LAKE CITY, UT 84111

**PHONE NUMBER**
(801)382-7576

**REGISTERED AGENT**
CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON DE  19808

**AGENT NUMBER**
9000014

| AUTHORIZED STOCK | | DESIGNATION/ | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | STOCK CLASS | | |
| 2015/10/14 | | COMMON | 50,000,000 | .0010000000 |
| | | PREFERRED | 40,000,000 | .0010000000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| ERIC B HALE | | 175 SOUTH MAIN STREET, SUITE 500 SALT LAKE CITY, UT 84111 | CEO |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| ERIC B HALE | | 175 SOUTH MAIN STREET, SUITE 500 SALT LAKE CITY, UT 84111 |
| SCOTT  HARTZ | | 1030 STATE STREET, SUITE 301 ERIE, PA 16501 |
| DAVID  BRIGATI | | 3540 WOODBINE STREET CHEVY CHASE, MD 20815 |

*NOTICE:  Pursuant to 8 Del. C.  502(b),  If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| ERIC B HALE 175 SOUTH MAIN STREET, SUITE 500 SALT LAKE CITY, UT 84111 US | 2017/11/15 | CEO |

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| TAASERA, INC. | 2017 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5008259 | 2011/07/08 | |

| PRINCIPAL PLACE OF BUSINESS | PHONE NUMBER |
|---|---|
| 1030 STATE STREET SUITE 300<br>ERIE, PA 16501 | (801)694-4659 |

| REGISTERED AGENT | AGENT NUMBER |
|---|---|
| CORPORATION SERVICE COMPANY<br>251 LITTLE FALLS DRIVE<br>WILMINGTON DE 19808 | 9000014 |

| AUTHORIZED STOCK | | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | | | |
| 2015/10/14 | | COMMON | 50,000,000 | .0010000000 |
| | | PREFERRED | 40,000,000 | .0010000000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| ERIC B HALE | | 1030 STATE STREET<br>ERIE, PA 16501 | CEO |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| ERIC B HALE | | 1030 STATE STREET SUITE 301<br>ERIE, PA 16501 |
| C SCOTT HARTZ | | 1030 STATE STREET SUITE 301<br>ERIE, PA 16501 |
| DAVID BRIGATTI | | 1030 STATE STREET SUITE 301<br>ERIE, PA 16501 |

NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| C SCOTT HARTZ<br>1030 STATE STREET SUITE 301<br>ERIE, PA 16501 US | 2018/03/01 | DIRECTOR |

# *State of Delaware*

# *Annual Franchise Tax Report*

| CORPORATION NAME | TAX YR. |
|---|---|
| TAASERA, INC. | 2018 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5008259 | 2011/07/08 | |

**PRINCIPAL PLACE OF BUSINESS**
1030 STATE STREET SUITE 300
ERIE, PA 16501

**PHONE NUMBER**
(801)694-4659

**REGISTERED AGENT**
CORPORATION SERVICE COMPANY
251 LITTLE FALLS DRIVE
WILMINGTON DE 19808

**AGENT NUMBER**
9000014

**AUTHORIZED STOCK**

| BEGIN DATE | END DATE | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| 2015/10/14 | | COMMON | 50,000,000 | .0010000000 |
| | | PREFERRED | 40,000,000 | .0010000000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| SCOTT HARTZ | | 1030 STATE STREET SUITE 300 ERIE, PA 16501 | CHAIRMAN |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| SCOTT HARTZ | | 1030 STATE STREET SUITE 300 ERIE, PA 16501 |
| ERIC B HALE | | 1030 STATE STREET SUITE 300 ERIE, PA 16501 |
| DAVID BRIGATI | | 1030 STATE STREET SUITE 300 ERIE, PA 16501 |

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| ERIC B HALE 1030 STATE STREET SUITE 300 ERIE, PA 16501 US | 2019/03/19 | CEO |

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | TAX YR. |
|---|---|
| TAASERA, INC. | 2019 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5008259 | 2011/07/08 | |

| PRINCIPAL PLACE OF BUSINESS | PHONE NUMBER |
|---|---|
| 175 SOUTH MAIN STREET<br>SALT LAKE CITY, UT 84111 | (801)382-7576 |

| REGISTERED AGENT | AGENT NUMBER |
|---|---|
| UNASSIGNED AGENT<br>95050 | 1 |

| AUTHORIZED STOCK | | DESIGNATION/ | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | STOCK CLASS | | |
| 2015/10/14 | | COMMON | 50,000,000 | .0010000000 |
| | | PREFERRED | 40,000,000 | .0010000000 |

| OFFICER | NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|---|
| ERIC BLAIR HALE | | 175 SOUTH MAIN ST<br>SALT LAKE CITY, UT 84111 | CEO |

| DIRECTORS | NAME | STREET/CITY/STATE/ZIP |
|---|---|---|
| ERIC BLAIR HALE | | 1575 E FEDERAL HEIGHTS DR<br>SALT LAKE CITY, UT 84103 |
| C  SCOTT HARTZ | | 1030 STATE STREET %23301<br>ERIE, PA 16501 |
| DAVID  BRIGATI | | 3540 WOODBINE STREET<br>CHEVY CHASE, MD 20815 |

NOTICE:  Pursuant to 8 Del. C.  502(b),  If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| ERIC BLAIR HALE<br>1575 E FEDERAL HEIGHTS DR<br>SALT LAKE CITY, UT 84103 US | 2021/05/17 | CEO |

# State of Delaware

# Annual Franchise Tax Report

| CORPORATION NAME | | TAX YR. |
|---|---|---|
| TAASERA, INC. | | 2020 |

| FILE NUMBER | INCORPORATION DATE | RENEWAL/REVOCATION DATE |
|---|---|---|
| 5008259 | 2011/07/08 | |

**PRINCIPAL PLACE OF BUSINESS**
175 SOUTH MAIN STREET
SALT LAKE CITY, UT 84111

**PHONE NUMBER**
(801)382-7576

**REGISTERED AGENT**
UNASSIGNED AGENT
 95050

**AGENT NUMBER**
1

| AUTHORIZED STOCK | | DESIGNATION/ STOCK CLASS | NO. OF SHARES | PAR VALUE/ SHARE |
|---|---|---|---|---|
| BEGIN DATE | END DATE | | | |
| 2015/10/14 | | COMMON | 50,000,000 | .0010000000 |
| | | PREFERRED | 40,000,000 | .0010000000 |

| OFFICER NAME | STREET/CITY/STATE/ZIP | TITLE |
|---|---|---|
| ERIC BLAIR HALE | 175 SOUTH MAIN STREET<br>SALT LAKE CITY, UT 84111 | CEO |

| DIRECTORS NAME | STREET/CITY/STATE/ZIP |
|---|---|
| ERIC BLAIR HALE | 1575 E FEDERAL HEIGHTS DR<br>SALT LAKE CITY, UT 84103 |
| C SCOTT HARTZ | 1030 STATE STREET %23301<br>ERIE, PA 16501 |
| DAVID  BRIGATI | 3540 WOODBINE STREET<br>CHEVY CHASE, MD 20815 |

*NOTICE: Pursuant to 8 Del. C. 502(b), If any officer or director of a corporation required to make an annual franchise tax report to the Secretary of State shall knowingly make any false statement in the report, such officer or director shall be guilty of perjury.*

| AUTHORIZED BY (OFFICER, DIRECTOR OR INCORPORATOR) | DATE | TITLE |
|---|---|---|
| ERIC BLAIR HALE<br>1575 E FEDERAL HEIGHTS DR<br>SALT LAKE CITY, UT 84103 US | 2021/05/17 | CEO |

# EXHIBIT F

State of Delaware
Secretary of State
Division of Corporations
Delivered  03:13 PM 10/09/2020
FILED  03:13 PM 10/09/2020
SR 20207751100 - File Number 5008259

# STATE OF DELAWARE
# CERTIFICATE OF RESIGNATION OF
# REGISTERED AGENT WITHOUT APPOINTMENT
# OF A SUCCESSOR REGISTERED AGENT

Pursuant to the provisions of Section 136 of Title 8 of the Delaware General Corporation Law, the undersigned agent for service of process, in order to resign as agent without appointment of a successor agent, hereby certifies that:

1.    The name of the Corporation is TAASERA, INC.
_____ .

2.    The name of the resigning agent is CORPORATION SERVICE COMPANY
_____ .

3.    That written notice of resignation was given to the affected Corporation at least 30 days prior to the filing of the certificate by mailing or delivering such notice to the Corporation at its address last known to the registered agent on 09/10/2020 _____ .

4.    The undersigned registered agent has submitted the last provided communications contact information to the Secretary of State as required by Section 136 of Title 8.

CORPORATION SERVICE COMPANY

By: /s/ Deborah A. Hampton
_____
Registered Agent

Name: Deborah A. Hampton
_____
Print or Type

Title: Assistant Secretary
_____

# EXHIBIT G

# STATE OF DELAWARE
# CERTIFICATE FOR REVIVAL OF CHARTER

The corporation organized under the laws of the State of Delaware, the charter of which was forfeited for failure to obtain a registered agent, now desires to procure a revival of its charter pursuant to Section 312 of the General Corporation Law of the State of Delaware, and hereby certifies as follows:

1.      The name of the corporation is      Taasera, Inc.

and, if different, the name under which the corporation was originally incorporated

2.      The Registered Office of the corporation in the State of Delaware is located at
8 The Green Street  Suite A                                                                 (street),
in the City of Dover                              ,County of Kent
Zip Code 19901                   . The name of the Registered Agent at such address upon whom process against this Corporation may be served is
A Registered Agent, Inc

3.      The date of filing of the Corporation's original Certificate of Incorporation in Delaware was July 8, 2011

4.      The corporation desiring to be revived and so reviving its certificate of incorporation was organized under the laws of this State.

5.      The corporation was duly organized and carried on the business authorized by its charter until the 8th          day of November             A.D. 2020        , at which time its charter became inoperative and forfeited for failure to obtain a registered agent and the certificate for revival is filed by authority of the duly elected directors of the corporation in accordance with the laws of the State of Delaware.

By: _____
                    Authorized Officer

Name: Eric B. Hale
                    Print or Type

State of Delaware
Secretary of State
Division of Corporations
Delivered 12:35 PM 05/18/2021
FILED 12:35 PM 05/18/2021
SR 20211856362 - File Number 5008259

# EXHIBIT H

CERTIFICATE OF AMENDMENT

TO THE

AMENDED AND RESTATED CERTIFICATE OF INCORPORATION

OF

<u>QUEST PATENT RESEARCH CORPORATION</u>

Quest Patent Research Corporation, a corporation organized and existing under the General Corporation Law of the State of Delaware (the "corporation"), does hereby certify:

1.     The Certificate of Incorporation of the corporation was filed with the Secretary of State on July 17, 1987.  An Amended and Restated Certificate of Incorporation (the "Restated Certificate of Incorporation") of the corporation was filed with the Secretary of State on January 22, 2016.

2.     Paragraph (a) of Article FOURTH of the Restated Certificate of Incorporation is hereby amended and restated to read as follows:

"FOURTH: (a) The total number of shares of capital stock which the Corporation shall have authority to issue is forty million (40,000,000) shares, of which (i) ten million (10,000,000) shares are designated as preferred stock, with a par value of $0.00003 per share ("Preferred Stock"), and (ii) thirty million (30,000,000) shares are designated as common stock, with a par value of $0.00003 per share ("Common Stock")."

3.     Upon the filing of this Certificate of Amendment, each share of Common Stock, par value of $0.00003 per share, outstanding on such date shall automatically become and be converted into 0.01 of a share of such Common Stock, with fractional shares being rounded up to the next higher whole number of shares.

4.     This Amendment to the Restated Certificate of Incorporation has been duly adopted in accordance with the provisions of Sections 242 of the General Corporation Law of Delaware.

5.     The capital of the corporation will not be reduced under or by reason of any amendment herein certified.

IN WITNESS WHEREOF, Quest Patent Research Corporation has caused this Certificate to be signed by its Chief Executive Officer this 27th day of July, 2022.

/s/ Jon C. Scahill
Jon C. Scahill, Chief Executive Officer

State of Delaware
Secretary of State
Division of Corporations
Delivered  04:18 PM 07/27/2022
FILED  04:18 PM 07/27/2022
SR  20223105547  -  File Number   2132451

{00515524.DOC.1}

# EXHIBIT I

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, D.C. 20549**

**FORM 10-K**

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the fiscal year ended December 31, 2021

or

☐ **TRANSITION REPORT UNDER SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission file number 33-18099-NY

**QUEST PATENT RESEARCH CORPORATION**
(Exact name of registrant as specified in its charter)

| **Delaware** | **11-2873662** |
|---|---|
| (State or other jurisdiction of Incorporation or organization) | (I.R.S. Employer Identification No.) |
| **411 Theodore Fremd Ave., Suite 206S, Rye, NY** | **10580-1411** |
| (Address of principal executive offices) | (Zip Code) |

Registrant's telephone number, including area code: (888) 743-7577

Securities registered under Section 12(g) of the Exchange Act: None

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐  No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or 15(d) of the Act. ☐

Note - Checking the box above will not relieve any registrant required to file reports pursuant to Section 13 or 15(d) of the Exchange Act from their obligations under those Sections.

Indicate by check mark whether the registrant (1) filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒  No ☐

Indicate by check mark whether the registrant has submitted every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit and post such files). Yes ☒  No ☐

Indicate by check mark if disclosure of delinquent filers in response to Item 405 of Regulation S-K (§229.405 of this chapter) is not contained herein, and will not be contained, to the best registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendments to this Form 10-K. ☒

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☒ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting fi rm that prepared or issued its audit report. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Act). Yes ☐  No ☒

State the aggregate market value of the voting and non-voting common equity held by non-affiliates computed by reference to the price at which the common equity was sold, or the average bid and asked price of such common equity, as of the last business day of the registrant's most recently completed second fiscal quarter: $2,612,706 as of June 30, 2021.

As of March 31, 2022, the registrant had 533,334,630 shares of common stock outstanding.

# PART I

**ITEM 1. BUSINESS**

<u>Overview</u>

We are an intellectual property asset management company. Our principal operations include the acquisition, licensing and enforcement of intellectual property rights that are either owned or controlled by us or one of our wholly-owned subsidiaries. We currently own, control or manage fifteen intellectual property portfolios, which principally consist of patent rights. As part of our intellectual property asset management activities and in the ordinary course of our business, it has been necessary for us or the intellectual property owner who we represent to initiate, and it is likely to continue to be necessary to initiate, patent infringement lawsuits and engage in patent infringement litigation. We anticipate that our primary source of revenue will come from the grant of licenses to use our intellectual property, including primarily licenses granted as part of the settlement of patent infringement lawsuits.

Intellectual property monetization includes the generation of revenue and proceeds from the licensing of patents, patented technologies and other intellectual property rights. Patent litigation is often, and for us has been, a necessary element of intellectual property monetization where a patent owner, or a representative of the patent owner, seeks to protect its patent rights against the unlicensed manufacture, sale, and use of the owner's patent rights or products which incorporate the owner's patent rights. In general, we seek to monetize the bundle of rights granted by the patents through structured licensing and when necessary enforcement of those rights through litigation, although to date all of our patent license revenues have resulted from litigation. To date all of our revenue from the licensing of our patents has resulted from litigation commenced by us.

We intend to develop our business by acquiring intellectual property rights, either in the form of ownership of or an exclusive license to the underlying intellectual property. Our goal is to enter into agreements with inventors of innovative technologies for which there may be a significant market for products which use or incorporate the intellectual property. We seek to purchase all of, or interests in, intellectual property in exchange for cash, securities of our company, the formation or a joint venture or separate subsidiary in which the owner has an equity interest, and/or interests in the monetization of those assets. Our revenue from this aspect of our business can be generated through licensing and, when necessary, which is typically the case, litigation. We engage in due diligence and a principled risk underwriting process to evaluate the merits and potential value of any acquisition, partnership or joint venture. We seek to structure the terms of our acquisitions in a manner that will achieve the highest risk-adjusted returns possible, in the context of our financial condition. In connection with the acquisition of intellectual property portfolios, we have granted the party providing the financing an interest in any recovery we have with respect to the intellectual property purchased with the financing, and we expect that we will have to continue to grant such interests until and unless we have generated sufficient cash from licensing our intellectual property to enable us to acquire additional intellectual property portfolios without outside financing. However, we cannot assure you that we will ever generate sufficient revenues to enable us to purchase additional intellectual property without third-party financing.

1

### *Taasera Portfolio*

Acquired by our wholly-owned subsidiary, Taasera Licensing LLC ("TLL"), this portfolio consists of 29 United States patents and 2 foreign patents which generally relate to the field of network security (the "Taasera Portfolio"). In June 2021 seven patents were acquired via assignment from Taasera, Inc. for the purchase price of $250,000. In August 2021 acquired a portfolio of network security patents from Daedalus Blue LLC ("DBL") consisting of 22 United States patents and 2 foreign patents. Original assignees of the patents acquired from DBL include International Business Machines Corporation, Internet Security Systems, Inc. and Fiberlink Communications Corporation ("Fiberlink"). ISS and Fiberlink were acquired by IBM in 2006 and 2013, respectively. In September 2019, IBM divested over 500 United States patent assets, as well as a number of foreign counterparts in Asia, Europe, and elsewhere, to Daedalus Group, and affiliate of DBL. Pursuant to the acquisition agreement, DBL is entitled to a portion of the net proceeds from monetization of the TLL portfolio.

In November 2021, TLL brought patent infringement suits in the U.S. District for the Eastern District of Texas against Trend Micro Incorporated. In February 2022, TLL brought patent infringement suits in the U.S. District for the Eastern District of Texas against Checkpoint Software Technologies Ltd. and Palo Alto Networks, Inc.

### *Soundstreak Portfolio*

Acquired through our acquisition of all of the issued and outstanding equity interests of Soundstreak Texas LLC ("STX") in August 2021 for a purchase price consisting of 50% of the net proceeds resulting from monetization of the patent portfolio, this patent portfolio consists of three United States patents and one pending patent application which generally relate to streaming data (including audio or video) while also storing higher quality versions of the same data locally. The patented technology has applications in the professional recording industry, digital audio/video industries, the drone/remote capture industry, the teleconferencing industry, and more.

In August 2021, STX brought a patent infringement suit in the U.S. District for the Eastern District of Texas against Yamaha Corporation and Steinberg Media Technologies GMBH. In September 2021, STX brought patent infringement suits in the U.S. District for the Eastern District of Texas against Sony Group Corporation, Panasonic Corporation, Olympus Corporation and Nikon Corporation.

The actions against Sony Group Corporation, Panasonic Corporation, Olympus Corporation and Nikon Corporation were resolved in 2021 and our revenue for the year ended December 31, 2021 includes revenue from any related settlements.

In March 2022, STX brought a patent infringement suit in the U.S. District for the Eastern District of Texas against Parrot SA, Delair SAS, Drone Volt, SA, EHang Holdings Limited and Flyability SA.

### *Multimodal Media Portfolio*

Acquired by the our wholly owned subsidiary, Multimodal Media LLC ("MML") in October 2021, the Multimodal Media portfolio consists of ten United States patents and one pending patent application which generally relate to systems and methods of recording and sending interactive messages and voice messages using mobile devices, as well as completing a communication after an incomplete call (the "Multimodal Media Portfolio"). MML advanced $550,000 at closing pursuant to an agreement with Aawaaz Inc. ("AI"). Under the agreement, MML retains an amount equal to the purchase price plus any fees incurred out of net proceeds, as defined in the agreement, after which AI is entitled to a percentage of further net proceeds realized, if any.

The Multimodal Media Portfolio was originally developed by Kirusa, Inc., a communications software development company founded in 2001 by Inderpal Mumick together with other technocrats with a dream of connecting people through the power of voice. Heralded by the invention of Voice SMS, Kirusa, Inc. was born with a vision to revolutionize the experiences users derived from their mobile phones.

In November 2021, MML brought patent infringement suits in the U.S. District for the Eastern District of Texas against ZTE Corporation and Guangdong OPPO Mobile Telecommunications Corp., Ltd.

### *LS Cloud Storage Portfolio*

We acquired this portfolio through our acquisition of all of the issued and outstanding equity interests of LS Cloud Storage Technologies LLC ("LSC") in November 2021, the LS Cloud Portfolio consists of four United States patents which generally relate to data sharing using distributed cache.

In March 2022, LSC brought patent infringement suits in the U.S. District for the Eastern District of Texas against Microsoft Corporation, Google LLC, Cisco Systems, Inc. and Amazon.com, Inc. et.al.

13

### Risks Relating to Monetizing our Intellectual Property Rights

<u>We may not be able to monetize our intellectual property portfolios</u>. Although our business plan is to generate revenue from our intellectual property portfolios, we have not been successful in generating any significant positive cash flow from our portfolios, we have not generated any revenues from several of our intellectual property portfolios and we have ceased allocating resources toward the monetization of several of our portfolios. We cannot assure you that we will be able to generate any significant revenue from our existing portfolios or that we will be able to acquire new intellectual property rights that will generate significant revenue.

<u>If we are not successful in monetizing our portfolios, we may not be able to continue in business</u>. Although we have ownership of some of our intellectual property, we also license the rights pursuant to agreements with the owners of the intellectual property. If we are not successful in generating revenue for those parties who have an interest in the results of our efforts, those parties may seek to renegotiate the terms of our agreements with them, which could both impair our ability to generate revenue from our intellectual property and make it more difficult for us to obtain rights to new intellectual property rights. If we continue to be unable to generate revenue from our existing intellectual property portfolios and any new portfolios we may acquire, we may be unable to continue in business.

<u>If we are not successful in patent litigation, the defendants may seek to have the court award attorneys' fees to them against us which could result in the bankruptcy of the plaintiff subsidiary and may result in a default under our agreement QFL</u>. The United States patent laws provide that "the court in exceptional cases may award reasonable attorney fees to the prevailing party." Although the patents are owned by our subsidiaries and any judgment would be awarded against the subsidiaries, the subsidiaries have no assets other than the patent rights. Our funding sources for our patent litigation do not provide for the funding source to pay any judgment against us. Thus, if any defendants obtain a judgment against one of our subsidiaries, they may seek to enforce their judgment against the patents owned by the subsidiary or seek to put the subsidiary into bankruptcy and acquire the patents in the bankruptcy proceeding. As a result, it is possible that an adverse verdict in a petition for legal fees could result in the loss of the patents owned by the subsidiary and a default under our agreement with QFL.

<u>Our inability to acquire intellectual property portfolios will impair our ability to generate revenue and develop our business</u>. We do not have the personnel to develop patentable technology by ourselves. Thus, we need to depend on acquiring rights to intellectual property and intellectual property portfolios from third parties on an ongoing basis. In acquiring intellectual property rights, there are delays in (i) identifying the intellectual property which we may want to acquire, (ii) negotiating an agreement with the owner or holder of the intellectual property rights, and (iii) generating revenue from those intellectual property rights which we acquire. During these periods, we will continue to incur expenses with no assurance that we will generate revenue. We currently hold intellectual property portfolios from which we have not generated any revenue to date, and we cannot assure you that we will generate revenue from our existing intellectual property portfolios or any additional intellectual properties which we may acquire.

<u>We may be unable to enforce our intellectual property rights unless we obtain third party funding</u>. Because of the expense of litigation and our lack of working capital, we may be unable to enforce our intellectual property rights unless we obtain the agreement of a third party to provide funding in support of our litigation. We cannot assure you that QFL or any other funding source provide us any necessary funding, and the failure to obtain such funding may impair our ability to monetize our intellectual property portfolio or continue in business.

<u>Because we need to rely on third-party funding sources to provide us with funds to enforce our intellectual property rights we are dependent upon the perception by potential funding sources of the value of our intellectual property</u>. Because we do not have funds to pursue litigation to enforce our intellectual property rights, we are dependent upon the valuation which potential funding sources, which currently is QFL, give to our intellectual property or any intellectual property we may acquire. In determining whether to provide funding for intellectual property litigation, the funding sources need to make an evaluation of the strength of our patents, the likelihood of success, the nature of the potential defendants and a determination as to whether there is a sufficient potential recovery to justify a significant investment in intellectual property litigation. Typically, such funding sources receive a percentage of the recovery after litigation expenses, and seek to generate a sufficient return on investment to justify the investment. Under our agreement with QFL, QFL is allocated all of the net proceeds (after allowable expenses) until it has received a negotiated return. Unless QFL or any other funding source believes that it will generate a sufficient return on investment, it will not fund litigation. If QFL does not fund our acquisition or monetization of intellectual property we propose to acquire, we cannot assure you that we will be able to negotiate funding agreements with third party funding sources on terms reasonably acceptable to us, if at all. Because of our financial condition, we may only be able to obtain funding on terms which are less favorable to us than we would otherwise be able to obtain.

29

Although we have a funding agreement with QFL, there is no assurance that we QFL will provide funding for portfolios we are looking to acquire or that we will generate revenue from any funded litigation. Although the funding source makes its evaluation as to the likelihood of success, patent litigation is very uncertain, and we cannot assure you that, we will obtain litigation funding or that, if we obtain litigation funding, we will be successful or that any recovery we may obtain will generate any significant positive cash flow from operations for us.

Because QFL and Intelligent Partners hold a security interest in almost all of our intellectual property and the proceeds from our intellectual property, we may not be able to raise funds through a debt financing. Pursuant to our agreements with QFL and Intelligent Partners, we granted them a security interest in the stock of our subsidiaries that hold the intellectual property acquired from Intellectual Ventures and in the proceeds from the monetization of intellectual property acquired from Intellectual Ventures and our mobile data and financial data portfolios. The inability to grant a security interest in these assets to a new lender would materially impair our ability to obtain debt financing for our operations, and may also impair our ability to obtain financing to acquire additional intellectual property rights.

Because of our financial condition and our having generated a loss from operations in 2021 and 2020 from our existing portfolios, we may not be able to obtain intellectual property rights to the most advanced technologies. In order to generate meaningful revenues from intellectual property rights, we need to be able to identify, negotiate rights to and offer technologies for which there is a developing market. Because of our financial condition and the terms under which we obtain financing for our litigation, we may be unable to negotiate rights to technology for which there which will be a strong developing market, or, if we are able to negotiate agreements for such intellectual property, the terms of our purchase or license may not be favorable to us. Accordingly, we cannot assure you that we will be able to acquire intellectual property rights to the technology for which there is a strong market demand.

Potential acquisitions may present risks, and we may be unable to achieve the financial or other goals intended at the time of any potential acquisition. Our ability to grow depends, in large part, on our ability to acquire interests in intellectual property, including patented technologies, patent portfolios, or companies holding such patented technologies and patent portfolios. Accordingly, we intend to engage in acquisitions to expand our intellectual property portfolios and we intend to continue to explore such acquisitions. Such acquisitions are subject to numerous risks, including the following:

- our failure to have sufficient funding to enable us to make the acquisition, together with the terms on which such funding is available, if at all;

- our failure to have sufficient personal to satisfy the seller that we have the personnel to monetize the assets we propose to acquire;

- dilution to our stockholders to the extent that we use equity in connection with any acquisition;

- our inability to enter into a definitive agreement with respect to any potential acquisition, or if we are able to enter into such agreement, our inability to consummate the potential acquisition;

- difficulty integrating the operations, technology and personnel of the acquired entity;

- our inability to achieve the anticipated financial and other benefits of the specific acquisition;

- difficulty in maintaining controls, procedures and policies during the transition and monetization process;

- diversion of our management's attention from other business concerns, especially considering that we have only one full-time employee/officer who is responsible for performing due diligence, negotiating agreements, negotiating funding and implementing a monetization program; and

- our failure, in our due diligence process, to identify significant issues, including issues with respect to patented technologies and intellectual property portfolios, and other legal and financial contingencies.

30

If we are unable to manage these risks and other risks effectively as part of any acquisition, our business could be adversely affected.

Our acquisition of intellectual property rights may be time consuming, complex and costly, which could adversely affect our operating results. Acquisitions of patent or other intellectual property assets, which are and will be critical to the development of our business, are often time consuming, complex and costly to consummate. We may utilize many different transaction structures in our acquisitions and the terms of such acquisition agreements tend to be heavily negotiated. As a result, we expect to incur significant operating expenses and may be required to raise capital during the negotiations even if the acquisition is ultimately not consummated. Even if we are able to acquire particular intellectual property assets, there is no guarantee that we will generate sufficient revenue related to those intellectual property assets to offset the acquisition costs. We may also identify intellectual property assets that cost more than we are prepared to spend with our own capital resources. We may incur significant costs to organize and negotiate a structured acquisition that does not ultimately result in an acquisition of any intellectual property assets or, if consummated, proves to be unprofitable for us. These higher costs could adversely affect our operating results.

If we acquire technologies that are in the early stages of market development, we may be unable to monetize the rights we acquire. We may acquire patents, technologies and other intellectual property rights that are in the early stages of adoption in the commercial, industrial and consumer markets. Demand for some of these technologies will likely be untested and may be subject to fluctuation based upon the rate at which companies may adopt our intellectual property in their products and services. As a result, there can be no assurance as to whether technologies we acquire or develop will have value that we can monetize. It may also be necessary for us to develop additional intellectual property and file new patent applications as the underlying commercial market evolves, as a result of which we may incur substantial costs with no assurance that we will ever be able to monetize our intellectual property.

Our intellectual property monetization cycle is lengthy and costly and may be unsuccessful. We expect to incur significant marketing, legal and sales expenses prior to entering into monetization events that generate revenue and cash flow from operations for us. We will also spend considerable resources educating potential licensees on the benefits of entering into an agreement with us that may include a non-exclusive license for future use of our intellectual property rights. Thus, we may incur significant losses in any particular period before any associated revenue stream begins. If our efforts to convince potential licensees of the benefits of a settlement arrangement are unsuccessful, we may need to continue with the litigation process or other enforcement action to protect our intellectual property rights and to realize revenue from those rights. We may also need to litigate to enforce the terms of existing agreements, protect our trade secrets, or determine the validity and scope of the proprietary rights of others. Enforcement proceedings are typically protracted and complex. The costs are typically substantial, and the outcomes are unpredictable. Enforcement actions will divert our managerial, technical, legal and financial resources from business operations.

We may not be successful in obtaining judgments in our favor. We have commenced litigation seeking to monetize our intellectual property portfolios and it will be necessary for us to commence ligation in the future. All litigation is uncertain, and a number of the actions we commenced have been dismissed by the trial court. We cannot assure you that any litigation will be decided in our favor or that, if damages are awarded or a license is negotiated, that we will generate any significant revenue from the litigation or that any recovery may be allocated to counsel and third party funding source which may result in little if any revenue to us.

Our financial condition may cause both intellectual property rights owners and potential licensees to believe that we do not have the financial resources to commence and prosecute litigation for infringement. Because of our financial condition, both intellectual property rights owners and potential licensees may believe that we do not have the ability to commence and prosecute sustained and expensive litigation to protect our intellection rights with the effect that (i) intellectual property rights owners may be reluctant to grant us rights to their intellectual property and (ii) potential licensees may be less inclined to pay for license rights from us or settle any litigation we may commence on terms which generate any meaningful monetization.

Any patents which may be issued to us pursuant to patent applications which we filed or may file may fail to give us necessary protection. We cannot be certain that patents will be issued as a result of any pending or future patent applications, or that any of our patents, once issued, will provide us with adequate protection from competing products. For example, issued patents may be circumvented or challenged, declared invalid or unenforceable, or narrowed in scope. In addition, since publication of discoveries in scientific or patent literature often lags behind actual discoveries, we cannot be certain that we will be the first to make additional new inventions or to file patent applications covering those inventions. It is also possible that others may have or may obtain issued patents that could prevent us from commercializing our products or require us to obtain licenses requiring the payment of significant fees or royalties in order to enable us to conduct our business. As to those patents that we may acquire, our continued rights will depend on meeting any obligations to the seller and we may be unable to do so. Our failure to obtain or maintain intellectual property rights for our inventions would lead to the loss of our investments in such activities, which would have a material adverse effect on us.

31

The provisions of Federal Declaratory Judgment Act may affect our ability to monetize our intellectual property. Under the Federal Declaratory Judgment Act, it is possible for a party who we consider to be infringing upon our intellectual property to commence an action against us seeking a declaratory judgment that such party is not infringing upon our intellectual property rights. In such a case, the plaintiff could choose the court in which to bring the action and we would be the defendant in the action. Common claims for declaratory judgment in patent cases are claims of non-infringement, patent invalidity and unenforceability. Although the commencement of an action requires a claim or controversy, a court may find a letter from us to the alleged infringer seeking a royalty for the use of our intellectual property rights to form the basis of a controversy. In such a case, the plaintiff, rather than we, would choose the court in which to bring the action and the timing of the action. In addition, when we commence an action as plaintiff, we may be able to enter into a contingent fee arrangement with counsel, it is possible that counsel may be willing to accept such an arrangement if we are the defendant. Further, we would not have the opportunity of choosing against which party to bring the action. An adverse decision in a declaratory judgment action could significantly impair our ability to monetize the intellectual property rights which are the subject of the litigation. We have been a defendant in one declaratory judgment action, which resulted in a settlement. We cannot assure you that potential infringers will not be able to use the Declaratory Judgment Act to reduce our ability to monetize the patents that are the subject of the action.

A 2014 Supreme Court decision could significantly impair business method and software patents. In June 2014, the United States Supreme Court, in Alice v. CLS Bank, struck down patents covering a computer-implemented scheme for mitigating "settlement risk" by using a third party intermediary, holding the patent claims to be ineligible as being drawn to a patent-ineligible abstract idea. The courts have been dealing for many years over what business methods are patentable. We cannot predict the extent to which the decision in Alice as well as prior Supreme Court decisions dealing with patents, will be interpreted by courts. To the extent that the Supreme Court decision in Alice gives businesses reason to believe that business model and software patents are not enforceable, it may become more difficult for us to monetize patents which are held to be within the ambit of the patents before the Supreme Court in Alice and for us to obtain counsel willing to represent us on a contingency basis. As a result, the decision in Alice could materially impair our ability to obtain patent rights and monetize those which we do obtain.

Legislation, regulations or rules related to obtaining patents or enforcing patents could significantly increase our operating costs and decrease our revenue. We may apply for patents and may spend a significant amount of resources to enforce those patents. If legislation, regulations or rules are implemented either by Congress, the United States Patent and Trademark Office, or the courts that impact the patent application process, the patent enforcement process or the rights of patent holders, these changes could negatively affect our expenses and revenue. For example, new rules regarding the burden of proof in patent enforcement actions could significantly increase the cost of our enforcement actions and make it more difficult to sign licenses without litigation, changes in standards or limitations on liability for patent infringement could negatively impact our revenue derived from such enforcement actions, and any rules requiring that the losing party pay legal fees of the prevailing party could also significantly increase the cost of our enforcement actions. United States patent laws were amended with the enactment of the Leahy-Smith America Invents Act, or the America Invents Act, which took effect on March 16, 2013. The America Invents Act includes a number of significant changes to U.S. patent law. In general, the legislation attempts to address issues surrounding the enforceability of patents and the increase in patent litigation by, among other things, establishing new procedures for patent litigation. For example, the America Invents Act changes the way that parties may be joined in patent infringement actions, increasing the likelihood that such actions will need to be brought against individual parties allegedly infringing by their respective individual actions or activities. The America Invents Act and its implementation increases the uncertainties and costs surrounding the enforcement of our patented technologies, which could have a material adverse effect on our business and financial condition. In addition, the U.S. Department of Justice has conducted reviews of the patent system to evaluate the impact of patent assertion entities on industries in which those patents relate. It is possible that the findings and recommendations of the Department of Justice could impact the ability to effectively license and enforce standards-essential patents and could increase the uncertainties and costs surrounding the enforcement of any such patented technologies.

32

In 2021, non-cash investing and financing activities consisted of shares issued for conversion of debt of approximately $556,000, interest added to principal of approximately $6,000 and options granted for settlement of debt of approximately $598,000. In 2020, non-cash investing and financing activities consisted of resolution of derivative liability of $320,000 and interest added to principal of approximately $3,000.

We cannot assure you that we will be successful in generating future revenues, in obtaining additional debt or equity financing or that such additional debt or equity financing will be available on terms acceptable to us, if at all, or that we will be able to obtain any third party funding in connection with any of our intellectual property portfolios.

We cannot predict the success of any pending or future litigation seeking to enforce our intellectual property rights.

In February 2021, we signed a funding agreement with QFL, as described in "Agreements with QFL and Intelligent Partners" above and in "Summary of Agreements with QFL" in Item 1. Business.

As noted below, there is a substantial doubt about our ability to continue as a going concern.

**Critical Accounting Policies**

The discussion and analysis of our financial condition and results of operations is based upon our financial statements that have been prepared in accordance with accounting principles generally accepted in the United States of America. The preparation of these financial statements requires us to make estimates and judgments that affect the reported amounts of assets and liabilities. On an on-going basis, we evaluate our estimates including the allowance for doubtful accounts, the salability and recoverability of our products, income taxes and contingencies. We base our estimates on historical experience and on other assumptions that we believe to be reasonable under the circumstances, the results of which form our basis for making judgments about the carrying values of assets and liabilities that are not readily apparent from other sources. Actual results may differ from these estimates under different assumptions or conditions.

*Principles of Consolidation*

Our consolidated financial statements are prepared in accordance with US GAAP and present the financial statements of us and our wholly-owned subsidiaries. In the preparation of our consolidated financial statements, intercompany transactions and balances are eliminated.

*Use of Estimates and Assumptions*

The preparation of financial statements in conformity with generally accepted accounting principles in the United States of America requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. Actual results could differ from those estimates.

*Revenue Recognition*

*Patent Licensing Fees*

Revenue is recognized upon transfer of control of promised bundled intellectual property rights and other contractual performance obligations to licensees in an amount that reflects the consideration we expect to receive in exchange for those intellectual property rights. Revenue contracts that provide promises to grant "the right" to use intellectual property rights as they exist at the point in time at which the intellectual property rights are granted, are accounted for as performance obligations satisfied at a point in time and revenue is recognized at the point in time that the applicable performance obligations are satisfied and all other revenue recognition criteria have been met.

For the periods presented, revenue contracts executed by the Company primarily provided for the payment of contractually determined, one-time, paid-up license fees in consideration for the grant of certain intellectual property rights for patented technologies owned or controlled by the Company's operating subsidiaries. Intellectual property rights granted included the following, as applicable: (i) the grant of a non-exclusive, retroactive and future license to manufacture and/or sell products covered by patented technologies, (ii) a covenant-not-to-sue, (iii) the release of the licensee from certain claims, and (iv) the dismissal of any pending litigation. The intellectual property rights granted were perpetual in nature, extending until the legal expiration date of the related patents. The individual intellectual property rights are not accounted for as separate performance obligations, as (a) the nature of the promise, within the context of the contract, is to transfer combined items to which the promised intellectual property rights are inputs and (b) the Company's promise to transfer each individual intellectual property right described above to the customer is not separately identifiable from other promises to transfer intellectual property rights in the contract.

45

*Funding Liability*

The funding liability at December 31, 2021 represents the principal amount of the Company's obligations to QFL, a non-affiliated party, pursuant to a purchase agreement ("Purchase Agreement") dated February 22, 2021 between the Company and QFL, as described below. The obligation to QFL is classified as a current liability as of December 31, 2021.

On February 22, 2021, the Company entered into a series of agreements, all dated February 19, 2021,with QFL, including a Prepaid Forward Purchase Agreement (the "Purchase Agreement), a security agreement (the "Security Agreement"), a subsidiary security agreement (the "Subsidiary Security Agreement"), a subsidiary guaranty (the "Subsidiary Guarantee"), a warrant issue agreement (the "Warrant Issue Agreement"), a registration rights agreement (the "Registration Rights Agreement") and a board observation rights agreement (the "Board Observation Rights Agreement" together with the Security Agreement, the Subsidiary Guaranty, the Subsidiary Security Agreement, Warrant Issuance Agreement, Registration Rights Agreement and the Purchase Agreement, the "Investment Documents") pursuant to which, at the closing held contemporaneously with the execution of the agreements:

(i)      Pursuant to the Purchase Agreement, QFL agreed to make available to the Company a financing facility of: (a) up to $25,000,000 for the acquisition of mutually agreed patent rights that the Company intends to monetize; (b) up to $2,000,000 for operating expenses; and (iii) $1,750,000 to fund the cash payment portion of the restructure of the Company's obligations to Intelligent Partners. In return the Company transferred to QFL a right to receive a portion of net proceeds generated from the monetization of those patents.

(ii)      The Company used $1,750,000 of proceeds from the QFL financing as the cash payment portion of the restructure of the Company's obligations to Intelligent Partners pursuant to the Restructure Agreement executed contemporaneously with the closing of the Investment Documents. The payment was made directly from QFL to Intelligent Partners.

(iii)      Pursuant to the Security Agreement, the Company's obligations under the Purchase Agreement with QFL are secured by: (a) the proceeds (as defined in the Purchase Agreement); (b) the patents (as defined in the Purchase Agreement; (c) all general intangibles now or hereafter arising from or related to the foregoing (a) and (b); and (d) proceeds (including, without limitation, cash proceeds and insurance proceeds) and products of the foregoing (a)-(c).

(iv)      Pursuant to the Subsidiary Guaranty, eight of the Company's subsidiaries –QLC, NetTech, Mariner, Semcon, IC, CXT, M-Red, and AMI, collectively, the "Subsidiary Guarantors") guaranteed the Company's obligations to QFL under the Purchase Agreement.

(v)      Pursuant to the Subsidiary Security Agreement, the Subsidiary Guarantors granted QFL a security interest in the proceeds from the future monetization of their respective patent portfolios.

(vi)      Pursuant to the Warrant Issue Agreement, the Company granted QFL ten-year warrants to purchase a total of up to 96,246,246 shares of the Company's common stock, at an exercise price of $0.0054 per share which may be exercised from the date of exercise through February 18, 2031 on a cash or cashless basis. Exercisability of the warrant is limited if, upon exercise, the holder or any of holder's affiliates would beneficially own more than 4.99% (the "Maximum Percentage") of the Company's common stock, except that by written notice to the Company, the holder may change the Maximum Percentage to any other percentage not in excess of 9.99% provided any such change will not be effective until the 61st day following notice to the Company. The warrant also contains certain minimum ownership percentage antidilution rights pursuant to which the aggregate number of shares of common stock purchasable upon the initial exercise of the warrant shall not be less than 10% of the aggregate number of outstanding shares of capital stock of the Company (determined on a fully diluted basis). A portion of any gain from sale of the shares, net of taxes and costs of exercise, realized prior to the completion of all monetization activities shall be credited against the total return due to QFL pursuant to the Purchase Agreement. See Notes 4 and 5 for information on the warrant issuance and associated liability.

F-15

(vii)   The Company regained compliance with the OTCQB Eligibility Requirements on May 7, 2021, at which time the common stock recommenced trading on the OTCQB.

(viii)  The Company granted QFL certain registration rights with respect to the 96,246,246 shares of common stock issuable upon exercise of the warrant. See Note 5 for information on the warrant issuance.

(ix)    Pursuant to the Board Observation Rights Agreement, until the later of the date on which QFL or its affiliates (i) have received the entirety of their Investment Return (as defined in Purchase Agreement), and (ii) no longer hold any Securities (the "Observation Period"), the Company granted QFL the right, exercisable at any time during the Observation Period, to appoint a representative to attend meetings (including, without limitation, telephonic or other electronic meetings) of the Board or any committee thereof, including executive sessions, in an observer capacity.

On February 26, 2021, the Company entered into an agreement with Peter K. Trzyna ("PKT") pursuant to which PKT assigned to the Company all right, title, and interest in a portfolio of eight United States patents (the "Peregrin Portfolio"). Under the agreement, the Company paid PKT $350,000 at closing and agreed that upon the realization of gross proceeds, if any, the Company shall make a second installment payment or payments in the aggregate amount of $93,900 representing reimbursement to PKT, as the prosecuting attorney, for legal fees associated with prosecution of the portfolio, such reimbursement shall be due and payable to PKT from time to time as gross proceeds are realized, and paid to PKT along with and in proportion to reimbursement to other third parties of costs incurred in realizing gross proceeds from the Peregrin Portfolio. Thereafter, PKT is entitled to a percentage of gross proceeds realized, if any, from the Peregrin Portfolio. The Company requested and received a capital advance from QFL in the amount of $350,000 pursuant to the Purchase Agreement, which was used to make payment to PKT.

On May 20, 2021, Taasera Licensing LLC, a wholly owned subsidiary, entered into an agreement with Taasera, Inc. to acquire all right, title, and interest in a portfolio of seven United States patents (the "Taasera Portfolio") for $250,000. The Company requested and received a capital advance from QFL in the amount of $250,000 pursuant to the Purchase Agreement, which was used to make payment to Taasera, Inc.

On October 15, 2021, the Company's wholly owned subsidiary, Multimodal Media LLC ("MML"), acquired all right, title, and interest in a portfolio of nine United States patents (the "MML Portfolio") for a purchase price of $550,000 pursuant to an agreement with AI, pursuant to which MML retains an amount equal to the purchase price plus any fees incurred out of net proceeds, as defined in the agreement, after which AI is entitled to a percentage of further net proceeds realized, if any. The Company requested and received a capital advance from QFL in the amount of $550,000 pursuant to the Purchase Agreement, which was used to make payment to AI.

The Company requested and received operating capital advances in the amount of $1,000,000 from QFL pursuant to the Purchase Agreement during the year ended December 31, 2021.

*Loan Payable Related Party*

The loan payable – related party at December 31, 2021 represents the current amount of a non-interest bearing total monetization proceeds obligation (the "TMPO") to Intelligent Partners, LLC ("Intelligent Partners") of $2,805,000, pursuant to a restructure agreement ("Restructure Agreement") dated February 22, 2021 whereby the Company and Intelligent Partners, extinguished the Company's 10% note to Intelligent Partners as transferee of the notes issued to United Wireless Holdings, Inc. ("United Wireless"), in the amount of $4,672,810 pursuant to securities purchase agreement dated October 22, 2015 between the Company and United Wireless. The notes became due by their terms on September 30, 2020, and the Company did not make any payment on account of principal and interest on the notes. Subsequent to September 30, 2020, the Company engaged in negotiations with Intelligent Partners in parallel with the Company's negotiations with QFL, with a view to restructuring the Company's obligations under the United Wireless agreements, including the notes, so that the Company no longer had any obligations under the notes or the SPA. These negotiations resulted in the Restructure Agreement, described below, which provided for the payment to Intelligent Partners of $1,750,000 from the proceeds from the Company's agreements with QFL. As part of the restructure of the Company's agreements with Intelligent Partners, the Company amended the existing monetization proceeds agreements ("MPAs") and granted Intelligent Partners certain rights in the monetization proceeds from any new intellectual property the Company acquires, as describe below. Under these MPAs, Intelligent Partners participates in the monetization proceeds the Company receives with respect to new patents after QFL has received its negotiated rate of return.

F-16

The economic terms of the inventor agreements, funding agreements and contingent legal fee arrangements associated with the patent portfolios owned or controlled by the Company's operating subsidiaries, if any, including royalty rates, proceeds sharing rates, contingent fee rates and other terms, vary across the patent portfolios owned or controlled by the operating subsidiaries. Inventor royalties, payments to noncontrolling interests, payments to third party funding providers and contingent legal fees expenses fluctuate period to period, based on the amount of revenues recognized each period, the terms and conditions of revenue agreements executed each period and the mix of specific patent portfolios with varying economic terms and obligations generating revenues each period. Inventor royalties, payments to third party funding sources and contingent legal fees expenses will continue to fluctuate and may continue to vary significantly period to period, based primarily on these factors.

*Patent Enforcement and Other Litigation*

Certain of the Company's operating subsidiaries are engaged in litigation to enforce their patents and patent rights. In connection with these patent enforcement actions, it is possible that a defendant may request and/or a court may rule that an operating subsidiary has violated statutory authority, regulatory authority, federal rules, local court rules, or governing standards relating to the substantive or procedural aspects of such enforcement actions. In such event, a court may issue monetary sanctions against the Company or its operating subsidiaries or award attorney's fees and/or expenses to a defendant(s), which could be material, and if required to be paid by the Company or its operating subsidiaries, could materially harm the Company's operating results and financial position. Since the operating subsidiaries do not have any assets other than the patents, and the Company does not have any available financial resources to pay any judgment which a defendant may obtain against a subsidiary, such a judgement may result in the bankruptcy of the subsidiary and/or the loss of the patents, which are the subsidiaries' only assets.

## NOTE 11 – BUSINESS COMBINATIONS

On August 6, 2021 the Company acquired all of the issued and outstanding equity interests of STX from Soundstreak, LLC in exchange for an obligation to coordinate and launch a structured licensing program around the STX patent portfolio which consists of three United States patents and one United States patent application. Soundstreak LLC is entitled to 50% of the net proceeds, as defined in the agreement, if any, resulting from monetization of the STX patent portfolio.

On November 16, 2021 the Company acquired all of the issued and outstanding equity interests of LS Cloud Storage Technologies, LLC ("LSC") in exchange for assuming ownership and management of the entity and bearing the transaction costs.

The acquisitions were accounted for in accordance with ASC 805, Business Combinations ("ASC 805"). ASC 805 provides, among other things, that the assets acquired and liabilities assumed constitute a business. If the assets acquired are not a business, the reporting entity shall account for the transaction or other event as an asset acquisition which are accounted for using a cost accumulation and allocation model under which the cost of the acquisition is allocated to the assets acquired and liabilities assumed. The STX and LSC were recorded as asset acquisitions.

The cost of the LSC asset acquisition was $500 in legal fees, expensed at closing. The initial cost of the STX asset acquisition was $0 with total consideration coming in the form of contingent consideration, which will be recognized if and when it becomes payable.

## NOTE 12 – SUBSEQUENT EVENTS

On January 27, 2022, the Company acquired, via assignment from Intellectual Ventures Assets 181 LLC and Intellectual Ventures Assets 174 LLC, all right title and interest to four patent portfolios consisting of fifteen United States patents and three foreign patents for a purchase price of $1,060,000. The Company requested and received a capital advance in the amount of the $1,060,000 purchase price from the facility with QFL.

On February 28, 2022, the Company filed a certificate of amendment to the certificate of incorporation of Quest Licensing Corporation, a New York corporation, changing the name of the corporation to Digital IP Advisors Incorporated.

In March 2022, the Company received operating capital advances in the amount of $200,000 from QFL pursuant to the Purchase Agreement.

# EXHIBIT J



Secretary of State
P.O. Box 13697
Austin, TX 78711-3697
FAX: 512/463-5709

Filing Fee: $300

### Certificate of Formation
### Limited Liability Company

**Filed in the Office of the**
**Secretary of State of Texas**
**Filing #: 804063674 05/12/2021**
**Document #: 1050755940003**
**Image Generated Electronically**
**for Web Filing**

### Article 1 - Entity Name and Type

The filing entity being formed is a limited liability company. The name of the entity is:

## Taasera Licensing LLC

### Article 2 – Registered Agent and Registered Office

☑A. The initial registered agent is an organization (cannot be company named above) by the name of:

## Truelove Law Firm PLLC

### OR

☐B. The initial registered agent is an individual resident of the state whose name is set forth below:

C. The business address of the registered agent and the registered office address is:

**Street Address:**
**100 West Houston Street**
**PO Box 1409  Marshall  TX  75671**

### Consent of Registered Agent

☐A. A copy of the consent of registered agent is attached.

### OR

☑B. The consent of the registered agent is maintained by the entity.

### Article 3 - Governing Authority

☑A. The limited liability company is to be managed by managers.

### OR

☐B. The limited liability company will not have managers. Management of the company is reserved to the members.

The names and addresses of the governing persons are set forth below:

Manager 1: (Business Name)  **Quest Patent Research Corporation**

Address:  **411 Theodore Fremd Ave   Suite 206S  Rye  NY, UMI  10580**

### Article 4 - Purpose

The purpose for which the company is organized is for the transaction of any and all lawful business for which limited liability companies may be organized under the Texas Business Organizations Code.

### Supplemental Provisions / Information

[The attached addendum, if any, is incorporated herein by reference.]

### Organizer

The name and address of the organizer are set forth below.

**Quest Patent Research Corporation**    **411 Theodore Fremd Ave., Ste 206S, Rye, NY 10580**

### Effectiveness of Filing

☑ A. This document becomes effective when the document is filed by the secretary of state.

### OR

☐ B. This document becomes effective at a later date, which is not more than ninety (90) days from the date of its signing. The delayed effective date is:

### Execution

The undersigned affirms that the person designated as registered agent has consented to the appointment. The undersigned signs this document subject to the penalties imposed by law for the submission of a materially false or fraudulent instrument and certifies under penalty of perjury that the undersigned is authorized under the provisions of law governing the entity to execute the filing instrument.

**Jon C. Scahill, CEO of Quest Patent Research Corporation**

Signature of Organizer

FILING OFFICE COPY

# TEXAS SECRETARY of STATE
# JOHN B. SCOTT

**BUSINESS ORGANIZATIONS INQUIRY - VIEW ENTITY**

| | | | |
|---|---|---|---|
| **Filing Number:** | 804063674 | **Entity Type:** | Domestic Limited Liability Company (LLC) |
| **Original Date of Filing:** | May 12, 2021 | **Entity Status:** | In existence |
| **Formation Date:** | N/A | | |
| **Tax ID:** | 32079205483 | **FEIN:** | |
| **Duration:** | Perpetual | | |

| | |
|---|---|
| **Name:** | Taasera Licensing LLC |
| **Address:** | PO BOX 1409 |
| | MARSHALL, TX 75671-1409 USA |

REGISTERED AGENT    FILING HISTORY    NAMES    MANAGEMENT    ASSUMED NAMES    ASSOCIATED ENTITIES    INITIAL ADDRESS

| View Image | Document Number | Filing Type | Filing Date | Effective Date | Eff. Cond | Page Count |
|---|---|---|---|---|---|---|
| 📄 | 1050755940003 | Certificate of Formation | May 12, 2021 | May 12, 2021 | No | 2 |

Order      Return to Search

---

Instructions:
🔴 To place an order for additional information about a filing press the 'Order' button.